[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 26, 2004
THOMAS K. KAHN
CLERK**

No. 01-17064

D. C. Docket No. 00-00382-CR-T-26

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RANDY W. BLANKENSHIP,
TAMMY J. BLANKENSHIP,
a.k.a. Tammy Blankenship Northrup,
a.k.a. Tammy Northrup, a.k.a. Tammy Owens,
TARAND TRANSPORT, INC.,
HOWARD L. GLOVER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(August 26, 2004)**

Before TJOFLAT and BLACK, Circuit Judges, and GOLDBERG[*], Judge.

_____

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

TJOFLAT, Circuit Judge:

The defendants in this case—Randy Blankenship, Tammy Blankenship, Howard Glover, and Tarand Transport, Inc.—were convicted of a variety of federal offenses stemming from an affirmative action fraud scheme they perpetrated regarding federally funded road construction projects. We conclude that the district court acted properly in conducting a joint trial of the defendants and that the defendants did not suffer undue prejudice due to the prosecution's closing arguments to the jury. However, we reverse the Blankenships' convictions for money laundering and most of Glover's convictions for making false statements, and remand this case to the district court so that the defendants may be resentenced.

I.

Because the defendants are challenging their convictions, we interpret the facts in the light most favorable to the government. See United States v. Pendergraft, 297 F.3d 1198, 1200 n.1 (11th Cir. 2002). The Florida Department of Transportation (the "FDOT") received grants from the United States Department of Transportation (the "USDOT") to subsidize construction of Interstate Highway 4 ("I-4"). As a condition of receiving these grants, the FDOT was contractually obligated to ensure that at least 12% of the USDOT's funds ultimately went to

2

"disadvantaged business enterprises" ("DBEs"). A DBE is a small firm owned and controlled by a woman or minority. See Fla. Admin. Code Ann. § 14-78.002(9).

The construction of I-4 was broken down into several smaller segments, including the "3430 project" and the "3431 project." The FDOT contracted with Granite Construction, one of the largest construction companies in the nation, to be its prime contractor on both projects. As part of its agreement with the FDOT, Granite was required to ensure that at least 12% of its subcontracts for both projects were set aside for DBEs. To help fulfill this requirement, Granite hired H.J. Trucking, a licensed DBE owned by Howard Glover (an African-American) to provide hauling services at the 3431 project construction site.

H.J. Trucking, however, never owned more than one dump truck or had any employees, and so was unable to perform such a large project. Consequently, Glover entered into an oral agreement with Randy and Tammy Blankenship ("the Blankenships"), who owned Tarand Transport, Inc. The Blankenships agreed to use Tarand's equipment and employees to do all the work on the 3431 project, while making Granite believe that it was being done by H.J. Trucking. Tammy Blankenship prepared various documents, including EEO forms, subcontracts, leases, and certified payroll records, to help foster the appearance that H.J.

3

Trucking's employees and owner-operators[1] were performing the hauling at the construction sites, when the people doing the work were really under Tarand's control.[2]

Glover gave Granite the address of Tarand Transport as H.J. Trucking's address, to which Granite sent its payments for the 3431 project. The checks Granite sent to H.J. Trucking's purported address were, appropriately enough, made out to H.J. Trucking. To cash these checks, Randy Blankenship opened an account at his bank in the name of "Randy Blankenship d/b/a/ H.J. Trucking." He would then deposit the checks into this account, and within a day withdraw most or all of the deposited funds and deposit them into Tarand's account. The Blankenships kept most of this money, giving Glover a payment each month for using his DBE license.

As this plan was being executed, Randy Blankenship (posing as an H.J.

---

[1] An independent contractor who owns his or her own truck and performs per diem work for a subcontractor is called an "owner-operator."

[2] Glover entered into a similar agreement with John Miller, who owned J.D. Miller & Sons, which was not a certified DBE. Consequently, Glover arranged for both J.D. Miller & Sons and Tarand Transport to actually perform the hauling for the 3431 project that H.J. Trucking was supposed to be performing. The indictment in this case named Miller and his company as co-defendants along with Glover, the Blankenships, and Tarand, but he subsequently entered into a plea agreement with the Government. Miller and his company were dismissed as defendants, and Miller testified at trial against Glover and the Blankenships. Consequently, he is not a party to this appeal. Miller had no involvement with the 3430 project (discussed later in this Part).

Trucking representative) entered into another agreement with Granite to have H.J. Trucking provide hauling services on the 3430 project as well. Blankenship signed Glover's name to the contract and submitted a variety of documents to Granite to make it seem as if H.J. Trucking was actually performing the work on this project, although it was really being done by Tarand. The record does not suggest that Glover knew anything of this second project; Granite sent payment directly to the address it had been given for H.J. Trucking (which, as noted above, was really Tarand's address). Tammy Blankenship prepared several documents in connection with the 3430 project to make it appear as if H.J. Trucking, rather than Tarand, was fulfilling this contract, as well.

For reasons not apparent from the record, Glover went to the authorities and confessed to his involvement with the Blankenships regarding the 3431 project. A federal grand jury thereafter returned a multicount indictment against the Blankenships, Tarand, and Glover. Count 1 charged Glover, the Blankenships, and Tarand with violating 18 U.S.C. § 371[3] for conspiring to defraud the federal

---

[3] Federal law provides,

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more or such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

government with regard to the 3431 project. Counts 4 through 15[4] charged these same parties under 18 U.S.C. § 1001[5] with making various false writings that were intended to give Granite (and, ultimately, the USDOT) the impression that H.J. Trucking, and not Tarand, was coordinating the work on the 3431 project. Among the allegedly false writings were subcontracts[6] and leases[7] that H.J. Trucking had entered into that made it appear that H.J. Trucking had the employees and equipment necessary to fulfill its responsibilities. These counts also included the false wage and hour records provided by H.J. Trucking that made it appear as if the people working on the project 3431 construction site were affiliated with H.J. Trucking instead of Tarand.[8] Glover, the Blankenships, and Tarand were also charged with three counts of mail fraud under 18 U.S.C. § 1341 (counts 20-22),

---

18 U.S.C. § 371.

[4] This opinion discusses the counts in the indictment in their most logical order, not in numerical order.

[5] Federal law provides, "Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the . . . Government of the United States, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry [shall be punished]." 18 U.S.C. § 1001(a)(3).

[6] Count 4 involved a subcontract between H.J. Trucking and Tarand; Count 8 involved a subcontract between H.J. Trucking and J.D. Miller & Sons.

[7] Counts 5-7 and 9-12 involved equipment leases between H.J. Trucking and various other companies, including Tarand and J.D. Miller & Sons.

[8] Counts 13-15 involved the wage and hour records on the 3431 project.

because Granite mailed H.J. Trucking (really Tarand) three separate checks as payment for the 3431 project.[9]

Count 2 of the indictment charged the Blankenships and Tarand with another violation of 18 U.S.C. § 371 for conspiring to defraud the United States government about the 3430 project.[10] Counts 16-19 charged the Blankenships and Tarand with making false statements in violation of 18 U.S.C. § 1001 to conceal their fraud regarding the 3430 project.[11] Specifically, they were charged with forging Glover's name on the subcontract for the 3430 project purportedly between Granite and H.J. Trucking,[12] as well as submitting false wage and hour records.[13] Counts 23-25 of the indictment charged them with mail fraud under 18 U.S.C. § 1341 because Granite separately mailed them three checks as payment for

---

[9] Federal law provides,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . any . . . matter or thing, shall be [punished].

18 U.S.C. § 1341.

[10] See supra note 3.

[11] See supra note 5.

[12] Count 17 concerns the subcontract between Granite and H.J. Trucking.

[13] Counts 16, 18, and 19 concern the wage and hour records on the 3430 project.

the 3430 project.[14]

The remainder of the indictment focused on Randy Blankenship's bank transactions. Count 3 of the indictment charged the Blankenships and Tarand under 18 U.S.C. § 1956(h) with conspiracy to launder money.[15] Counts 26-34 went on to charge them with various acts of money laundering under 18 U.S.C. § 1956(a)[16] for transactions associated with the H.J. Trucking account Randy opened.

The defendants pled not guilty to each count. They were tried together, and

---

[14] See supra note 9.

[15] 18 U.S.C. § 1956(h) makes it a crime to "conspire[] to commit any offense defined in this section . . . ." Section 1956(a)(1)(B)(i) states,

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . [shall be punished].

[16] See id.

with the exception of counts 4,[17] 8,[18] and 9,[19] the jury found them guilty as charged. Following sentencing, the defendants took these appeals.

This opinion is organized as follows. In Part II, we assess the defendants' claims that the district court abused its discretion in conducting a joint trial, rather than granting their motions for severance. Part III examines Glover's argument that the Government, in its closing argument to the jury, impermissibly commented on his decision not to testify. Part IV considers the sufficiency of the evidence to support the Blankenships' money laundering convictions under counts 26-34 (and, by extension, their conviction for conspiracy to commit money laundering under count 3), while Part V looks to the legitimacy of the defendants' convictions under counts 5-15 for making false statements.

## II.

Glover and the Blankenships filed two joint pretrial motions to have their trials severed from each other, claiming that their defenses were mutually antagonistic. Midtrial, the Blankenships made what they labeled a third motion

---

[17] Count 4 was the false statement conviction under § 1001 involving a subcontract between H.J. Trucking and Tarand.

[18] Count 8 was the false statement conviction under § 1001 involving a subcontract between H.J. Trucking and J.D. Miller & Sons.

[19] Count 9 was the false statement conviction under § 1001 involving a equipment lease between H.J. Trucking and J.D. Miller & Sons.

for severance.[20]  The district court denied all of these motions.

The permissibility of joint trials is governed by Rules 8 and 14 of the

---

[20]  As discussed later in this Part, a "motion for severance" may be made only prior to trial.  When a defendant claims midtrial that it would be improper to continue with a joint trial, the question for the court is whether to grant him a mistrial.

Under the Double Jeopardy Clause of the Constitution, U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."), a defendant has the right to go to verdict with the jury that is sworn in to hear his case.  See Wade v. Hunter, 336 U.S. 684, 689, 69 S. Ct. 834, 837, 93 L. Ed. 974 (1949) (acknowledging "a defendant's valued right to have his trial completed by a particular tribunal").  If Defendants A and B are tried jointly, they both have the constitutional right to have a verdict from the specific jury actually hearing their case (with due allowances made for alternates and the like).  If Defendant A moves midtrial to sever Defendant B, the Court could not simply cut Defendant B out of the case and order a new proceeding for him.  This would violate the Double Jeopardy Clause because such severance would deny Defendant B the right to a verdict from his original jury.  See, e.g., United States v. Butler, 41 F.3d 1435, 1439 (11th Cir. 1995) (reversing a defendant's conviction in a second trial on Double Jeopardy grounds where the district court in the first trial erroneously granted the Government's motion for "severance, or in the alternative, mistrial"); see also United States v. Huang, 960 F.2d 1128 (2d Cir. 1992) (noting that where a court grants a mistrial as to certain co-defendants based on a motion made by other co-defendants, the non-moving co-defendants may not be re-tried).

Consequently, the only way to understand a defendant's midtrial motion for severance is as a motion to sever that defendant, himself, from the trial and allow him to start over with a new jury; this is essentially a motion for a mistrial for that defendant.  See Depree v. Thomas, 946 F.2d 784, 792 (11th Cir. 1991) (noting that a "motion for severance . . . in effect, was a motion for mistrial"); United States v. Hickman, No. 94-5851, 1996 U.S. App. LEXIS 10326, at *7 (4th Cir. May 6, 1996) ("[T]he mistrial was a necessary consequence of [the defendant's] severance motion . . . .").  A defendant making a midtrial motion for severance is essentially arguing that circumstances have developed to the point where it would be unfairly prejudicial to allow the trial to proceed.  The Double Jeopardy Clause does not prohibit retrying defendants who seek mistrials, United States v. Scott, 437 U.S. 82, 93, 98 S. Ct. 2187, 2195, 57 L. Ed. 2d 65 (1978) (holding that a defendant's motion for a mistrial is "a deliberate election on his part to forego his valued right to have his guilt or innocence determined by the first trier of fact"), unless the mistrial is sought due to serious intentional prosecutorial misconduct.  Oregon v. Kennedy, 456 U.S. 667, 676, 102 S. Ct. 2083, 2089, 72 L. Ed. 2d 416 (1982) ("Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.").  Thus, we construe the Blankenships' midtrial motion for severance as a request that the court grant the Blankenships a mistrial.

10

Federal Rules of Criminal Procedure. Rule 8(b) states that two or more defendants may be charged in the same indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Because neither party challenges the structure of the indictment under this rule, we need not consider it.

Rule 14(a) states, "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." We have long recognized that "a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion." United States v. McGuire, 608 F.2d 1028, 1031 (5th Cir. 1979).[21] Consequently, we review the district court's decision for abuse of discretion, assessing each party's claims separately. We also emphasize that, in reviewing each of these rulings, we are looking over the shoulder of the trial judge, and may take into account only the

---

[21] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

considerations actually before him at the time he ruled. If a defendant moves for severance, and events occur later at trial that the judge had not been warned about, we may not conclude that the judge erred earlier by failing to grant a severance based on those later events that he had no way of considering. Of course, in light of such subsequent events, a defendant may again move for severance (or, more accurately, for a mistrial, see supra note 18), and the trial judge would be in a position to consider the entirety of the situation.

A.

Glover argues that he was severely prejudiced by the joint trial in two respects. First, Glover claims that he was denied a fundamentally fair trial in violation of the Fifth Amendment's Due Process Clause because he was not permitted to call Don Schuh, one of the Blankenships' trial attorneys, to the stand as a witness in his defense. Second, Glover maintains that, as a result of the joint trial, a potentially exculpatory statement he made to another witness, Tyrone Reddish, was excluded because it incriminated his co-defendants.

Both of Glover's claims fail. First, Glover never presented the district court with a motion to sever or a motion for a mistrial on either of these grounds. Second, although he contends that he was prevented from calling Schuh and

Reddish[22] to the stand, the record demonstrates that he never actually attempted to do so.

Admittedly, Schuh probably should not have represented the Blankenships at trial. Florida Rule of Professional Conduct 4-3.7(a) states, "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client" except in certain situations not applicable to the instant case. The fact remains, however, that the court never prevented Glover from calling him to the stand. Indeed, the Blankenships' lead counsel, Ronald Cacciatore, offered to make Schuh available to Glover to testify. Cacciatore stated at trial,

> I've talked to Mr. Schuh. If it will alleviate the problem, he is willing to testify. I can represent to the Court, based upon my conversation with him, he has no records. I know he doesn't charge by the hour and I do not believe his testimony would impeach Ms. Blankenship.

Because the district court did nothing to prevent Glover from calling Schuh to the stand, we reject his claim.

Glover's claim concerning Reddish borders on incoherence. At the end of Glover's case, his attorney stated that he would not be calling Tyrone Reddish to the witness stand because "[Assistant United States Attorney] Moore correctly

---

[22] Tyrone Reddish was an FDOT employee; Glover allegedly told Reddish that H.J. Trucking was not working on the 3431 project.

pointed out to me that I had a <u>Bruton</u> [<u>v. United States</u>, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)] problem with Mr. Reddish, so at this point, we will be resting." Again, there is nothing for us to review here because the decision not to call Reddish was made by Glover's attorney, and was not imposed upon Glover's attorney by the district court. A defense attorney's personal conclusion about a witness's ability to testify is not a ground for reversal. This development in the middle of the trial certainly does not impact the legitimacy of the district court's initial decision to hold a joint trial.

### B.

At the beginning of the trial, and then again midway through trial, the Blankenships moved for severance on the grounds of mutually antagonistic defenses and Glover's outright hostility toward them. We focus on the propriety of the district court's later ruling, because if the court was correct in denying a midtrial motion for mistrial on severance-related grounds, its earlier rulings not to sever—when it had even less evidence of potential prejudice before it—were necessarily correct.

Glover engaged in a variety of attacks against the Blankenships both before and during trial; his strategy was to claim that he was an innocent victim of their

manipulative schemes. For example, during a pretrial discussion, the trial judge stated that he remembered seeing Glover on television several months before. The judge told the Blankenship's attorneys that Glover "[w]as right adamant about what had been done to him. . . . [I]f Mr. Glover's mind set is the same as it was on that report, obviously, he has no love lost for [the Blankenships]." In his opening statement to the jury, Glover's attorney declared, "Howard Glover, as you will learn, is a victim of his own lack of sophistication. He is a victim . . . [of] an affirmative action program which is designed to help people like Mr. Glover, but instead has led to the corruption of such people as Tammy and Randy Blankenship . . . ." A few minutes later, Glover's attorney repeated this theme, "[H]aving a DBE made [Glover] an easy mark for those who had previously controlled the work performed on these roads, people like Tammy and Randy Blankenship and their trucking business, Tarand Trucking . . . ." Glover's attorney concluded, "Once you have heard all of the evidence in this case it will become clear that the prosecution cast its net too far, and that when it caught the true culprits it also unfortunately ensnared the innocent Mr. Glover." He emphasized this theme throughout the entire trial and in his closing argument to the jury.

Despite these facially persuasive facts, precedent compels us to reject the Blankenships' claims. In <u>Zafiro v. United States</u>, 506 U.S. 534, 113 S. Ct. 933,

15

122 L. Ed. 2d 317 (1993), the Supreme Court set down a two-step test for determining whether a defendant is entitled to a new trial due to a district court's refusal to sever prior to trial or to grant a mistrial once trial has commenced. First, a defendant must demonstrate that he was somehow prejudiced by a joint trial. Id. at 538, 113 S. Ct. at 938. However, the Court clarified that "[m]utually antagonistic defenses are not prejudicial per se." Id.[23] The Court specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced simply because "a jury will conclude [either] that both defendants are lying and convict them both on that basis, or that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." Id. at 540, 113 S. Ct. at 325-26.

After finding that a defendant has suffered prejudice under step one of the Zafiro test, we then turn to the second step—determining whether severance (or a mistrial) is the proper remedy for that prejudice. The Court emphasized, "Rule 14 does not require severance . . . [R]ather, it leaves the tailoring of the relief to be

---

[23] This holding implicitly overrules our prior rulings in United States v. Esle, 743 F.2d 1465, 1476 (11th Cir. 1984) (holding that severance is required if "the jury, in order to believe the core of testimony offered on behalf of [a] defendant must necessarily disbelieve the testimony offered on behalf of his co-defendant") (marks and citation omitted), and United States v. Rucker, 915 F.2d 1511, 1513 (11th Cir. 1990) ("[T]he trial judge should have realized that the Ruckers would present unavoidably antagonistic defenses and ordered separate trials.").

16

granted, if any, to the district court's sound discretion." Id. at 539, 113 S. Ct. at 938. There are only two circumstances in which severance is the only permissible remedy.

> [W]hen defendants properly have been joined under Rule 8(b), a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

Id. Aside from the two categories of defendants specified by the Supreme Court, most other defendants prejudiced by a joint trial are entitled only to curative instructions.

The first scenario for mandatory severance (or mistrial) described by the Court exists only where a joint trial leads to the denial of a constitutional right.[24]

---

[24] For example, in DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), we recognized that a defendant is denied a fair trial when an attorney for a co-defendant comments on his exercise of his Fifth Amendment right to remain silent. We held, "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately." Id. at 141. Similarly, a defendant's Sixth Amendment right to cross-examine is violated where the court admits into evidence a mutually incriminating confession of a co-defendant who does not take the stand. This court has repeatedly recognized that, even if given proper limiting instructions, a jury cannot possibly be expected to consider such a confession against only the defendant who made it. See Schaffer v. United States, 221 F.2d 17, 19 (5th Cir. 1955) ("We believe, however, that the two defendants were so inseparably connected that the jury could hardly have been expected to return a verdict of guilty against one and of not guilty as to the other."); United States v. Haupt, 136 F.2d 661, 672 (7th Cir. 1943) ("We doubt if it was within the realm of possibility for this jury to limit its consideration of the damaging effect of such statements merely to the defendant against whom they were admitted.").

17

Regarding the second scenario mentioned by Zafiro, the Court did not clearly explain what it meant by a jury being prevented from "making a reliable judgment." Based on the Court's ensuing discussion, however, as well as an examination of subsequent precedent, it seems that courts have applied this exception in primarily three situations. While this list appears to be fairly comprehensive, it is quite possible that other factors could also prevent a jury from "making a reliable judgment."

First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant. This is a concern, for example, "where the . . . gruesome evidence against one defendant overwhelms the de minimus evidence against the co-defendant(s)," United States v. Gray, 173 F. Supp. 2d 1, 24 (D.D.C. 2001); see, e.g., United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980) (mandating severance where limiting instructions "could not provide their intended protection against prejudice in the face of this emotional evidence").

In general, the strong presumption is that jurors are able to compartmentalize evidence by respecting limiting instructions specifying the defendants against whom the evidence may be considered.

> The mere fact that there may be an 'enormous disparity in the evidence admissible against [one defendant] compared to the other defendants' is not a sufficient basis for reversal. A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants.

United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997) (marks and citation omitted); see also United States v. Balter, 91 F.3d 427, 433 (3d Cir. 1996) ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant or some evidence adduced is more damaging to one defendant than others.") (quotation marks and citations omitted).[25]  Severance must be granted where evidence is admissible against only one defendant only where that evidence is so convincing that not even limiting instructions are likely to prevent the jury from considering the evidence against all co-defendants.  "The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994); see also United States v.

_____

[25]  Schlei tells us that severance is not required simply based on the quantity of evidence admissible only against other co-defendants.  The other cases discussed above direct courts to look to the quality or nature of evidence admissible only against other co-defendants, to see if it is of a gruesome, powerful, or essentially dispositive type that intrinsically calls into question a jury's ability or willingness to follow limiting instructions.

19

Baker, 98 F.3d 330 (8th Cir. 1996) (reversing conviction for failure to sever where "very prejudicial and highly inflammatory" evidence admissible against only one co-defendant was introduced because "the risk of substantial prejudice from the spillover effect . . . was too high to be cured by less drastic measures"); United States v. Briscoe, 896 F.2d 1476, 1498 (7th Cir. 1990) ("Generally, a cautionary instruction will be sufficient to cure any unfair prejudice . . . . [H]owever, if the evidence creates an unacceptably high inference of wrongdoing against another defendant, the district court should either exclude the evidence or sever the trials."). In such cases, the better course of action is to have separate trials in order to confine such powerful evidence to the defendants against whom it may properly be used.

The "reliable judgment" exception also applies in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently. See United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998) ("A defendant satisfies the compelling prejudice requirement by showing that the jury was unable to sift through the evidence and make an individualized determination as to each defendant." (marks

and citation omitted)).  This aspect of the "reliable judgment" exception is epitomized by United States v. Gallo, in which the district court observed,

> This case is far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary.  And even where jurors would at first attempt to heed the judge's admonitions, they could hardly be expected to retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence.

668 F. Supp. 736, 753 (E.D.N.Y. 1987); see also Sampol, 636 F.2d at 647 (reversing conviction due to failure to grant a severance where "[t]here was never the clear distinction between the different defendants and the evidence against each of them that is called for by the Constitution's guarantee of a fair trial"); cf. United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939) (Hand, J.) (holding that severance was not required if "there was no reasonable ground for thinking that the jury could not keep separate what was relevant to each [defendant]").

Finally, severance is required under Zafiro where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants.[26]

---

[26]  See, e.g., United States v. Erwin, 793 F.2d 656, 666 (5th Cir. 1986) (holding that severance of a particular co-defendant was required because "[t]he charges against her were only

The defendants in this case are unable to pass either step of the Zafiro test.

First, they are unable to demonstrate prejudice. As Zafiro makes clear, the mere

existence of mutually antagonistic defenses is not inherently prejudicial.[27] The

Supreme Court has held that co-defendants do not suffer prejudice simply because

one co-defendant's defense directly inculpates another, or it is logically impossible

_____

peripherally related to those alleged against the other [co-defendants, and] [a]s the trial progressed it became increasingly apparent that very little of the mountain of evidence was usable against her"); Sampol, 636 F.2d at 646 (finding severance was required where a defendant was tried for making false statements to a grand jury and misprison of felony in the same trial as co-defendants accused of "the bombing murder of two people"); United States v. Maisonet, No. S3 97 Cr. 0817, 1998 U.S. Dist. LEXIS 9696, at *18 (S.D.N.Y. July 1, 1998) ("[The defendant] is not charged with any act of violence, nor is he charged with participating in the possession, sale, or distribution of narcotics. Given the nature and extent of evidence that the Government will likely introduce against both groups of co-defendants, the potential for prejudice against [the defendant] arising from a joint trial with either group is substantial.").

[27] We acknowledge that our holding in Cassano comes to the opposite conclusion. Citing several pre-Zafiro Eleventh Circuit cases, Cassano states that "[t]he assertion of mutually antagonistic defenses may satisfy the test for compelling prejudice . . . [when] the essence of one defendant's defense [is] contradicted by a co-defendant's defense." 132 F.3d at 652 (citing United States v. Perez-Garcia, 904 F.2d 1534, 1547 (11th Cir. 1990), United States v. Kelso, 863 F.2d 1564, 1568 (11th Cir. 1989), and United States v. Berkowitz, 662 F.2d 1127, 1132-34 (5th Cir. Unit B 1981)) (internal quotations omitted). The Cassano court's discussion of mutually antagonistic defenses did not cite Zafiro at all, and seems to be simply a reflection of our pre-Zafiro policy. We would nevertheless be bound to follow Cassano under our prior panel rule, except that in an earlier case, United States v. Strollar, 10 F.3d 1574, 1578 (11th Cir. 1994) (marks and citation omitted), we expressly adopted the Supreme Court's Zafiro analysis and held that "mutually antagonistic defenses are not prejudicial per se." We further recognized that the best solution in such situations is not severance, but for the trial judge to issue proper limiting instructions. Thus, given this conflict between our 1998 holding in Cassano and our 1994 holding in Strollar as to whether mutually antagonistic defenses are prejudicial and can warrant severance, we follow our earlier holding, which is luckily in accord with the Supreme Court's pronouncements on the subject. See Clark v. Housing Auth. of Alma, 971 F.2d 723, 726 n.4 (11th Cir. 1992) ("Where circuit authority is in conflict, the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc.").

22

for a jury to believe both co-defendants' defenses. Aside from pointing out their mutually antagonistic defenses, however, neither the Blankenships nor Glover have shown how the joint trial prejudiced them in any other legally cognizable way.

Furthermore, even if the defendants did suffer prejudice, they do not fall within either of Zafiro's categories of defendants to whom severance must be granted. First, putting aside Glover's meritless arguments (discussed in the preceding Section), none of the defendants claim that they had any of their substantive trial-related rights violated by the joint trial. Second, there is nothing about the joint trial that undermined the reliability of the jury's verdict. Specifically, there was no particularly powerful or dispositive evidence that was admissible against only one defendant but not the other. Moreover, this entire case concerned the parties' alleged criminal acts arising out of two construction contracts being carried out at roughly the same time. Because the defendants are alleged to have conspired with each other, and the numerous charges concern essentially related courses of criminal conduct, it was not unduly confusing to join them for trial. Consequently, we reject the defendants' claim that the district court erred in denying their motion to sever their trials.

We cannot help but recognize the inordinate, and most likely

23

counterproductive, hostile attitude that Glover's attorney adopted toward the Blankenships throughout the entire trial (as evidenced by the comments discussed above). Such vitriolic mudslinging, however, which need not be repeated here, frequently occurs when defendants raise mutually antagonistic defenses. As the jury was specifically instructed, the repeated slander of the Blankenships in Glover's opening statement and closing argument was not evidence. The fact that a defendant or his attorney is "a de facto prosecutor who will shift blame from himself to [co-defendants] . . . [does not] justif[y] severance." United States v. Andreas, 23 F. Supp. 2d 835, 847 (N.D. Ill. 1998).[28]

Before leaving the matter of prejudice arising from the joint trial, we feel it is particularly appropriate to voice our shock and disgust at the decision of Glover's attorney, Assistant Federal Public Defender Adam Allen, to attempt to inflame the jury by unnecessarily injecting race even further into an already contentious trial. Allen declared in his opening statement, "The evidence will show that Howard Glover is 52 years old and he was born and raised in a small town called Mulberry . . . a town which is unfortunately most famous for its lynchings . . . ." Later in the trial, Allen called Darlene Butler, Glover's sister, to

---

[28] We also note that in the nearly analogous case United States v. Anderson, 879 F.2d 369 (8th Cir. 1989), the Eighth Circuit held that the district court was justified in declining to sever the trial of the certified minority contractor from the trial of the nonminority contractors.

the witness stand.  Following some preliminary questions about her background,

he immediately asked the following questions:

Q:  And was your brother, Mr. Glover, born in Mulberry?
A:  Yes, he was.
Q:  Do you know where the town of Mulberry gets its name from?
A:  From a tree, and of course, that tree is called the Mulberry tree.
Q:  Is there any unfortunate history surrounding . . .

At this point, the court cut off Allen's questioning and held a sidebar, at which the

following exchange transpired:

THE COURT:  Mr. Allen, what in the world are you doing?  Are you going to talk about a hanging?
MR. ALLEN:  Well, Your Honor, in opening, I had indicated that Mr. Glover came from a small town which was famous for lynchings.  I was just going to . . .
THE COURT:  The Mulberry Tree and the lynching of an African-American, is that where you're going?
MR. ALLEN:   I wasn't going to go–
THE COURT:  What were you going into?
MR. ALLEN:  I was going to go into that Mulberry is famous for lynchings. . . .
THE COURT:  For what reason?  Why in the world would you want to interject race into this?
MR. ALLEN: Your Honor, I think part of the reason to be qualified DBE is that you come from a background of disadvantaged.
. . .
THE COURT: [Y]ou're not going to play the race card here.

We commend the district court for taking the initiative to immediately end

Allen's improper line of questioning.  We cannot say whether this was an attempt

to appeal specifically to the African-American members of the jury, to inflame the

entire jury against the Blankenships, or was simply a case of unmistakably poor judgment. Allen's stark admission, "I was going to go into that Mulberry is famous for lynchings. . . [,]" belies any notion that these questions were asked in good faith. There was no basis whatsoever for the introduction of such collateral, immaterial, and intrinsically inflammatory testimony. The district court's timely intervention is all that prevented the jury from being tainted by these vitriolic considerations.

These questions violated numerous rules of evidence, and came perilously close to crossing the line into an ethical violation (a result we do not foreclose should the district court choose to further investigate this matter). Such unconscionable appeals undermine the standards of decency and integrity that members of the bar are sworn to uphold, and reduce the solemn deliberations of the courtroom to little more than the ravings of the mob. While defending the accused is a noble calling, Allen's behavior was a credit neither to his profession, his colleagues, nor the American criminal justice system; such base tactics are the very antithesis of our system of reasoned, impartial justice.

### III.

Glover argues that the Government impermissibly commented in its closing argument on his failure to testify. The prosecution argued:

> [The Blankenships' and Glover's attorneys] are absolutely right, and the Judge will instruct you that the Government bears the burden of proof in this case. We bear the burden of proof in every criminal case, proof beyond a reasonable doubt. And the Defendants, as they sit there, don't have to prove anything. They don't have to testify, they don't have to prove a thing. <u>But, I submit to you that if they want you to believe a fact is true, then they're just like everybody else. They have a burden then to prove that fact.</u>

The underlined portion of the prosecution's argument is legally incorrect. With the exception of certain affirmative defenses, see <u>United States v. Gray</u>, 260 F.3d 1267, 1278 (11th Cir. 2001) ("Congress is entitled to shift the burden of proof to the defendant for an affirmative defense."), a defendant is never obligated to prove anything to a jury, and a jury is entitled to believe a defendant's claims regardless of whether he offers proof to substantiate them. The Blankenships, for example, argued that they acted in good faith throughout their interactions with Granite and Glover. It was not the Blankenships' responsibility to prove this; it was the Government's to disprove it.

While we recognize the blatant impropriety of the prosecutor's ill-considered statements, we do not believe they rise to the level of a constitutional violation. In <u>United States v. Knowles</u>, we held:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on

27

> the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.

66 F.3d 1146, 1162-63 (11th Cir. 1995) (marks and citations omitted). When the prosecutor's comment is viewed in light of his immediately preceding remarks, it becomes apparent that neither prong of the Knowles test is met. He expressly recognized the constitutional right of the defendants to remain silent and did not expressly cast aspersions on their choice to do so. Moreover, a jury may well have interpreted his statements as referring to the failure of the defense as a whole, rather than the defendants themselves through testimony, to prove their points (though, as discussed above, it was incorrect to imply that they were required to do so). Finally, we recognize that this one isolated comment occurred in the midst of a lengthy closing argument. A solitary comment would have to be much more prejudicial to the defendant in some way before we reverse a conviction on that basis. Consequently, we reject Glover's request for a new trial.

## IV.

The Blankenships and Tarand were convicted under 18 U.S.C. § 1956(a)(1)(B)(i), which establishes punishments for anyone who:

> knowing[ly] . . . conducts or attempts to conduct such a financial

transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

Randy Blankenship received checks made out to "H. J. Trucking" from Granite Construction. Because his bank would not allow him to deposit those checks into his personal account, he created a new account under the name of "Randy Blankenship d/b/a H. J. Trucking." [hereinafter, the "DBA Account"] He would deposit each check from Granite into his d/b/a account, immediately write out a new check drawn on this d/b/a account for the amount of the deposit, and deposit that check into his personal account.

We do not believe a reasonable juror could have concluded beyond a reasonable doubt that this conduct falls within the federal money laundering statute because there was insufficient evidence to demonstrate that Blankenship knew that his activities were designed to conceal "the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1356(a)(1)(B)(1). We base this conclusion on two important factors. First, at all times, the money was in an account with Blankenship's name on it; the only difference between the accounts was that the DBA Account also contained H.J. Trucking's name. Second, when Blankenship deposited the money into the DBA

29

Account, neither Granite nor anyone else had any way of determining what subsequently happened to it. As with all bank accounts, the DBA Account was private; no one (other than Blankenship, as the account holder) had any way of discovering its balance, what deposits or withdrawals were made, or the source of any of the funds in the account. Consequently, Blankenship did not receive—and could not reasonably have anticipated receiving—any marginal increase in secrecy by moving the money from one account with his name on it to another account with his name on it at the same bank. Indeed, as the chart in the indictment itself shows, anyone looking at his personal account would be able to tell immediately the origin of its revenue stream. We therefore fail to understand how the transfer could have been intended to conceal or disguise "the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1356(a)(1)(B)(1).

Further supporting our conclusion is the fact that the transfer was apparently motivated by a concern entirely unrelated to concealment. Perhaps the most persuasive evidence of this alternate motive is Randy's uncontradicted testimony that he had initially attempted to deposit the checks from Granite directly into his own account. He set up the DBA Account only when the bank refused to deposit Granite's checks into his original account. This strongly suggests that his purpose

in setting up the DBA Account was not to conceal the money or its origins, but simply to be able to access it.

Even if the jury disregarded Randy's admittedly self-serving testimony, it is strongly corroborated by the fact that Blankenship performed the minimum number of transactions reasonably necessary to allow him to spend the money from Granite. He did not shuffle the funds around numerous intermediary accounts in order to hide the true source of the money. Moreover, he did nothing at any time to dissociate himself either from the money sent by Granite or the accounts into which it was being deposited. Finally, the undisputed fact remains that nothing about the transaction suggests a motive to conceal the existence or source of the funds or his relationship to them.

In cases where a defendant does not violate an affirmative duty to disclose financial information, cf. United States v. Ward, 197 F.3d 1076, 1080 (11th Cir. 1999) ("[Defendant] concealed these accounts from the [bankruptcy] trustee by failing to disclose them."), one of the factors to which we look in determining whether a defendant's behavior constitutes "concealment" is whether he engages in unnecessary transactions to add extra "degrees of separation" between himself and the source of the funds. For example, in United States v. Majors, 196 F.3d 1206, 1214 (11th Cir. 1999), we stated, "Moving money through a large number of

31

accounts has, in light of other evidence . . . also been found to support the design element of money laundering, even when all the accounts to which the defendant transferred the money and from which he withdrew were in his own name." See also United States v. Dobbs, 63 F.3d 391, 397 (5th Cir. 1995) ("The purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities.").

Such transactions are regarded with an additional degree of skepticism when they involve accounts that cannot easily be linked to the defendant. For instance, in United States v. Thayer, 204 F.3d 1352, 1354-55 (11th Cir. 2000), we upheld a defendant's conviction because she

> funneled profits from [her corporation which was breaking the law] to [another corporation she owned] and other fictitious bank accounts and then eventually to her personal account. [This] evidence was plainly sufficient to prove that Lipton intended to conceal the funds that were generated from her fraudulent company that engaged in illegal activities.

See also United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir. 1999) (upholding defendant's money laundering conviction where funds from an illegal telemarketing fraud scheme were deposited into the accounts of a religious organization controlled by another organizer of the scheme).

32

Of course, we have never limited criminal liability under this statute to cases involving a long series of transactions; as § 1356(a) makes clear, even one transaction can be enough. For example, in United States v. Starke, 62 F.3d 1374, 1377 (11th Cir. 1995), we upheld a money laundering conviction against a defendant who did nothing more than take currency from undercover agents which he had reason to believe was drug-related, go to his bank, and purchase cashiers checks made out to those agents. Without much analysis or discussion, we affirmed his conviction because we found there was enough evidence for a jury to conclude that the transactions "were designed to conceal the funds or the source of the funds." Id. at 1384. The crux of cases like Starke, however, is that the money is better concealed or concealable after the transaction than before.

In short, this case does not have any of the indicia of money laundering we discussed in Majors:

> Evidence that may be considered when determining whether a transaction was designed to conceal includes, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounds the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

Majors, 196 F.3d at 1213 n.18 (quoting United States v. Garcia-Emanuel, 14 F.3d

33

1469, 1475-76 (10th Cir. 1994)) (italics omitted). Furthermore, affirming the Blankenships' convictions would extend the money laundering statute to virtually any financial transactions involving the proceeds of allegedly unlawful activities, a result directly at odds with the text and purpose of the statute. Cf. Garcia-Emanuel, 14 F.3d at 1474 (holding that we must engage in "the difficult task of separating money laundering, which is punishable by up to twenty years in prison, from mere money spending, which is legal. . . . If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.").

We have previously held that "the evidence of concealment must be substantial." Majors, 196 F.3d at 1213. Given the persuasive explanation Blankenship offered for the transfer, the lack of even circumstantial evidence reasonably supporting any other motive, and the undeniable fact that the transfer itself could not reasonably have been anticipated to have furthered any of the goals prohibited by the money laundering statute, no reasonable juror could have concluded beyond a reasonable doubt that Blankenship intended to conceal the funds. In any event, the Government's proof of such intent was certainly not "substantial," as required by Majors. Even if we believed this to be a close case, the rule of lenity would compel us to interpret the statute as excluding the conduct

at issue from the scope of money laundering, thereby giving the Blankenships the benefit of the doubt. United States v. Inclema, No. 03-14584, 2004 U.S. App. LEXIS 5793, at *11 (11th Cir. Mar. 29, 2004) ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, the rule of lenity dictates that we are to choose the harsher one only when Congress has spoken in language that is clear and definite.") (quotation marks and citation omitted).

We also note that our resolution of this issue is largely in accord with the Sixth Circuit's ruling in United States v. McGahee, 257 F.3d 520 (6th Cir. 2001). In that case, one of the defendants, Douglas McGuire, was a supervisor in the City of Memphis's office of Housing and Community Development (HCD's). A co-conspirator who worked for HCD drafted checks from HCD to McGuire, who deposited them into an account designated "Douglas McGuire d/b/a W.G. Williams Enterprises." McGuire then wrote several checks from that account to cover his personal expenses. He was convicted of several counts of "concealment" money laundering. The Government claimed "that when McGuire wrote checks on the business account or converted the money to cash, he was concealing the fact that he illegally obtained the funds from [HCD] and that the funds were earmarked for certain properties." Id. at 527. The Tenth Circuit reversed, holding, "McGuire's conduct does not evidence a design to conceal the

proceeds of illegal activity. The checks drawn on the account were not intended to conceal how he got the funds, but merely to convert them to liquid assets. Nor were the transactions designed to create the appearance of legitimate wealth. The funds were transmitted in a direct, ordinary, and open manner." Id. at 528.

Here, of course, Blankenship transferred the funds to his personal bank account (at the same bank) before spending them. As discussed above, however, this did not in any way afford him any marginal increase in secrecy, or serve to dissociate himself from the funds in any way. Consequently, since McGahee held that the direct expenditure of funds from a "d/b/a account" with a person's name was not money laundering, we are reluctant to conclude that the simple transfer of those funds into the defendant's personal account (which also has his name on it) is money laundering.

This seems to be a simple case of governmental overreaching. Thus, we reverse the Blankenships' and Tarand's convictions on the money laundering counts (Counts 26-34), as well as their conviction for conspiracy to launder money (Count 3), and direct the district court to enter a judgment of acquittal on these counts.

V.

Only Glover challenges his § 1001 convictions. Though his brief claims

only that the district court lacked jurisdiction over these charges, the Government's brief urges us to construe his claim as an attack on the sufficiency of the evidence supporting his § 1001 convictions. Accepting this invitation, we will determine whether the elements of § 1001 were correctly interpreted and satisfied in this case. Section A discusses the "falsity" requirement of § 1001, while Section B discusses whether the statements at issue were "within the jurisdiction" of the federal government.

### A.

Several of Glover's convictions were under § 1001(a)(3) for making false writings. Counts 4-15 of the indictment charged Glover with "knowingly and willfully mak[ing] and us[ing] a false writing and document, knowing the same to contain materially false, fictitious and fraudulent statements and entries." The allegedly false documents included subcontracts and equipment leases into which H.J. Trucking had entered (counts 5-7 and 10-12)[29], as well as wage and hour records H.J. Trucking had submitted (counts 13-15).

For a conviction to be sustained under § 1001(a)(3), it is imperative that the "writing or document" be "false." We do not take issue with the "falseness" of the wage and hour records addressed in counts 13-15 because those records state facts

---

[29] Glover was acquitted of the § 1001 false-statement charges in counts 4, 8, and 9.

37

that are simply untrue.  However, we are unconvinced that the contracts and leases at issue in the other counts can be considered "false."

The terms "false lease" and "false contract" do not frequently appear in federal jurisprudence.  Based on our analysis of both the text of § 1001 and the caselaw, it appears there are only two ways in which a contract can possibly be considered "false."  First, a contract is false if a person forges or alters it.  Like a forged birth certificate or counterfeit currency, the document itself would be, quite literally, false.

For example, in United States v. Holley, 826 F.2d 331 (5th Cir. 1987), the defendants were both employees of the federal government's Farmers Home Administration ("FHA").  One of the defendants, Holley, was responsible for awarding FHA contracts to private contractors to repair farmers' homes in his county.  His co-defendant, Hyland, was an FHA inspector and was ineligible to receive such contracts.  To circumvent this requirement, Hyland forged his stepson's signature on dozens of contracts to make it appear as if the contracts were being awarded to the stepson rather than Hyland.  Holley, knowing of the forgery, nevertheless approved the contracts.  Such contracts were undoubtedly "false" within the core meaning of the term.  See also United States v. Voorhees, 593 F.2d 346, 349 (8th Cir. 1979) (affirming a conviction for a false lease where

38

the defendant "placed [a third party's] signature on the lease without [the third party's] knowledge . . . . This altered lease formed the basis of count 3 of the indictment, upon which [defendant] was convicted.").

This is not the case here, however. The leases and subcontract at issue were between H.J. Trucking and Tarand, and the Government does not contend that anyone other than the owners of H.J. Trucking and Tarand signed them or subsequently altered them. Consequently, the contracts are not "false" in the sense that anyone other than the purported signatories actually created them.

The only other way in which a contract can be "false" is if it contains factual misrepresentations. For example, in United States v. Jespersen, 65 F.3d 993 (2d Cir. 1995), the defendant, Jespersen, was a manager at the IRS responsible for hiring contractors to perform maintenance work on the IRS building. Jespersen made one of the contractors to whom he regularly awarded such work remodel his kitchen counters and porch storm windows for free. In 1992, after this remodeling was completed, a grand jury began investigating Jespersen's relationship with the contractor. Jespersen had the contractor draw up a contract "indicat[ing] that Jespersen had paid $3,000 as an initial deposit, and had made additional payments of $3,000 and $3,600 on November 29, 1988 and December 16, 1988, respectively," for the remodeling work in Jespersen's home. The contractor back-

39

dated the contract, and the defendant signed it with a back-dated signature and turned it over to a grand jury as evidence that he had not been receiving free work from the contractor. Such a contract is clearly a "false document," in that it contained several affirmative statements of fact that were blatantly untrue.

Again, this is not the case here. There is not a single false statement in any of the equipment leases mentioned in count 5-7 and 9-12. These documents merely state what the lessor and lessee agree to do. The Government argues, of course, that these documents are inherently "false" because neither party actually intended to carry through on their promises. Superficially, the Government's argument is quite persuasive. Courts have recognized in many contexts that "under section 1001, a promise may amount to a 'false, fictitious or fraudulent' statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform." United States v. Shah, 44 F.3d 285, 294 (5th Cir. 1995). Many courts of appeals have upheld convictions of defendants who made promises or guarantees concerning their future actions that, at the time they made those promises, they had no intention of carrying out. Most of these cases involve false guarantees made on applications for government benefits or programs. See, e.g., Elmore v. United States, 267 F.2d 595, 603 (4th Cir. 1959)

40

(upholding conviction of defendant who certified that he would use wheat purchased with government assistance for feeding livestock because "15 U.S.C.A. § 714m(a) should be interpreted to [prohibit] not only false statements of existing fact but also false and fraudulent promises which the maker does not intend to perform"); Corcoran v. United States, 229 F.2d 295 (5th Cir. 1956) (upholding § 1001 conviction of veterans who obtained G.I. loans to purchase houses by falsely claiming on loan applications that they intended to live in those houses).

This case is easily distinguishable. When a person makes a certification on an application for a government program, he is actually certifying that he believes those statements concerning his future behavior are true. For instance, in Corcoran, veterans applying for loan assistance had to promise that, at the time they filled out the application for government assistance, they actually intended to live in the house they were buying. The Corcoran document wasn't a contract; it was an application.

Contracts, in contrast, are much different. A contract is a document that serves only to establish a legal relationship between two parties; it gives each party nothing more than a legal expectancy in having the other party either perform or (generally) respond in damages. See, e.g., Mississippi Valley Generating Co. v. United States, 147 Ct. Cl. 1, 34 (1959) (Byran, J., concurring)

41

("A covenant of a contract is a pledge–something 'more than a promise and lesse [sic] than an Oath'–to perform or respond in damages.") (emphasis added), rev'd on other grounds, United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S. Ct. 294, 5 L. Ed. 2d 268 (1961).  It is not illegal for a party to breach a contract; a contract gives a party two equally viable options (perform or pay compensation), between which it is generally at liberty to choose.  A "promise" contained in a contract is not a certification that the promisor will actually perform the specified acts, or presently intends to perform those acts, but is instead a grant of a legal right to the other party to either enjoy performance or receive damages. Indeed, the whole notion of "efficient breach" is that a party should abrogate its contractual responsibilities if a more profitable opportunity comes along.  See Thyssen, Inc. v. S.S. Fortune Star, 777 F.2d 57, 63 (2d Cir. 1985) ("[B]reaches of contract that are in fact efficient and wealth-enhancing should be encouraged, and . . . such 'efficient breaches' occur when the breaching party will still profit after compensating the other party for its 'expectation interest.'").

Moreover, a party has the power to waive its rights under a contract—that is, a party may choose not to enforce a contract if the other side breaches.  In re Garfunkle, 672 F.2d 1340, 1347 (11th Cir. 1982) ("A party may waive any right which it is legally entitled to, including rights secured by contract.").  A contract

does not state or imply that either party will actually enforce its contractual obligations. It is nothing more than an instrument which gives each party the legal right to do so; how they choose to exercise that power (or whether they ever intended to exercise it at all) is a matter beyond the four corners of the document, and has no impact on whether the contract itself is "false."

The Government may be correct in alleging that the parties to the contracts at issue entered into them in bad faith, with an intent to mislead Granite and the FDOT. That is, H.J. Trucking probably never actually intended to lease equipment from any of the companies with whom it entered into leases. However, even if that is true, the contract did nothing more than give H.J. Trucking the legal right to lease the equipment and to sue for breach of contract if the other party refused to carry through on its promises. The strong likelihood that neither party subjectively intended to carry through on these subcontracts or leases does nothing to undermine their legal efficacy. The enforceability of a contract depends on its objective representations rather than parties' subjective intentions. See United States v. Weaver, 905 F.2d 1466, 1473 (11th Cir. 1990) ("What controls is upon what the parties agreed, not upon what they did not agree. The contract, once created, is to be interpreted in accordance with the objective import of its unambiguous terms."). As Justice Holmes wrote, "The law has nothing to do with

the actual state of the parties' minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct." Oliver Wendell Holmes, The Common Law 242 (Howe ed. 1963); see also A. Corbin, Corbin on Contracts, § 9 (1952) ("It is by the conduct of the two parties, by their bodily manifestations, that we must determine the existence of what is called agreement."). The contracts at issue actually created the legal rights they purported to create; the creation of such legal rights is the sole purpose of a contract. Presentation of a contract to a third party does not convey an implicitly guarantee either that the parties to the contract intended to perform, or that they intended to actually enforce their contractual rights. A contract is nothing more, and nothing less, than what it actually states. Consequently, though the contracts in one sense may be "shams," in that neither party ever intended to enforce their contractual rights, this does not render the contracts "false."

Our approach in this case strongly resembles that taken by the Supreme Court in United States v. Williams, 458 U.S. 279, 102 S. Ct. 3088, 73 L. Ed. 2d 767 (1982). In Williams, the defendant had accounts in multiple banks. The government claimed that he deposited checks drawn on his first account with the bank holding his second account, knowing full well that there were insufficient funds to cover this deposit. He was prosecuted under 18 U.S.C. § 1014, which

prohibits making "false statements" to federally insured banks.  The Supreme

Court overturned his conviction, holding:

> Although petitioner deposited several checks that were not supported
> by sufficient funds, that course of conduct did not involve the making
> of a 'false statement,' for a simple reason: technically speaking, a
> check is not a factual assertion at all, and therefore cannot be
> characterized as 'true' or 'false.'  Petitioner's bank checks served
> only to direct the drawee banks to pay the face value to the bearer,
> while committing petitioner to make good the obligations if the bank
> dishonored the drafts.  Each check did not, in terms, make any
> representations as to the state of petitioner's bank balance.

Id. at 284-85, 102 S. Ct. at 3091.  The Court further held, "[I]f Congress really set

out to enact a national bad check law in § 1014, it did so with a peculiar choice of

language and in an unusually backhanded manner."  Id. at 287, 102 S. Ct. at 3093.

The Court concluded,

> Given this background—a statute that is not unambiguous in its terms
> and that if applied here would render a wide range of conduct
> violative of federal law, a legislative history that fails to evidence
> congressional awareness of the statute's claimed scope, and a subject
> matter that traditionally has been regulated by state law—we believe
> that a narrow interpretation of § 1014 would be consistent with our
> usual approach to the construction of criminal statutes.

Id. at 290, 102 S. Ct. at 3094.

The Supreme Court's reasoning applies with equal force in the instant case.

Like a check, a contract is not a factual assertion, and therefore cannot be

characterized as "true" or "false."  Just as a check gives its recipient the legal right

to payment either from the bank or the drawer, so too a contract gives the other party the legal right either to performance or compensation. While a check, by its terms, does not "make any representations as to the state of petitioner's bank balance," id. at 284-85, 102 S. Ct. at 3091, a contract does not make any representations as to a party's intention to perform instead of paying damages, or to exercise its rights under the contract. Just as a check is not "false" simply because neither the drawer nor the drawee intends that the drawee cash it, a contract is not false simply because neither party intends to enforce it. Finally, and perhaps most persuasively, just as there is no evidence that Congress intended § 1014 to be a national bad check law, displacing vast amounts of state legislation, there is no evidence that Congress intended § 1001 to be a national "false contract" law, occupying an area that has been a cornerstone of the common law for the better part of a millennium.[30]

---

[30] The dissent contends that the Supreme Court's holding in Williams was subsequently given a narrow interpretation by United States v. Swearingen, 858 F.2d 1555 (11th Cir. 1988) (per curiam). In Swearingen, the defendant and one of his friends, Millian, each owned an auto dealership that was in perpetual need of cash. When the defendant needed funds, he would prepare a "draft" that "represented to the Bank that Millian had purchased a car from [the defendant] and would pay for the car by honoring the draft." Id. at 1556. The bank then credited the defendant's account by the amount of the draft. When the bank attempted to collect the draft from Millian, Millian would give his bank a draft from the defendant, showing that the defendant had purchased a car from him and would pay for the car by honoring the draft. "The drafts [the defendant] and Millian drew on each other and presented to the [bank] involved fictitious automobile sales." Id.

We found the drafts to be "false representations" and affirmed Swearingen's convictions under 18 U.S.C. § 371. The dissent contends that, on this basis, we should find the

46

Finally, if there remains doubt as to whether the term "false" in § 1001 should be interpreted as extending to contractual promises, the rule of lenity construes us to rule in favor of the defendants and construe the statute narrowly. See Inclema, 2004 U.S. App. LEXIS 5793, at *11.

In light of these powerful considerations, as a matter of law, we are forced to overturn Glover's convictions under counts 5-7 and 10-12.

B.

Section 1001 prohibits people from making false statements concerning "any matter within the jurisdiction of the executive . . . branch of the [federal] [g]overnment." For the reasons discussed in this Section, we do not believe that

---

representations in the leases and subcontracts to be false statements and affirm Glover's convictions. The problem with this argument is that the representations of past fact in the drafts in Swearingen are totally different from the creation of prospective legal rights by the leases and subcontracts in this case. As the Swearingen court explained, "The drafts were in the form of an envelope. On its face, the envelope bore a description and the sales price of the vehicle purportedly sold; inside, the envelope contained the documents necessary to transfer title to [the defendant] or Millian. These documents were of course false, in that the parties did not intend them to evidence a genuine transaction." Id. We held that "through the envelope drafts involved in this case the Defendant made false factual assertions with the specific intent to defraud the Bank." Id. at 1557.

The drafts in Swearingen contained empirically falsifiable factual assertions concerning the past—for example, that the defendant had actually sold Millian a car. In this case, in contrast, Glover did actually enter into legally binding leases and subcontracts with the other parties to the agreements. The agreements are exactly what they purport to be—legally effective instruments that actually establish rights and responsibilities. Whether or not Glover intended in the future to exercise his rights under those agreements, for example by taking custody of the vehicles over which he had legally acquired a leasehold interest, is an entirely separate question. In Swearingen, on the other hand, the past sales upon which the drafts were based never, in fact, occurred. Consequently, our conclusion is entirely consistent with this precedent.

47

the false statements at issue here concerned matters within the jurisdiction of the federal government. Consequently, we are forced to overturn Glover's convictions under counts 5-7 and 10-15.[31]

The Supreme Court has emphasized that "the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." Bryson v. United States, 396 U.S. 64, 70, 90 S. Ct. 355, 359, 24 L. Ed. 2d 264 (1969). Nevertheless, the scope of the term does have limits. In United States v. Rodgers, 466 U.S. 475, 479, 904 S. Ct. 1942, 1946, 80 L. Ed. 2d 452 (1984), the Court explained that this phrase "covers all matters confided to the authority of [a federal] agency or department. . . . A department or agency has jurisdiction, in this sense, when it has power to exercise authority in a particular situation."

In the instant case, Glover (and the Blankenships) were convicted of making false statements to Granite, a private construction company under contract to build roads for the FDOT. The FDOT, in turn, was under contract with the USDOT to adhere to federal specifications and requirements. As the uncontradicted testimony of the Government's witnesses demonstrated, the USDOT dealt exclusively with the FDOT and looked solely to the FDOT to implement its

---

[31] This analysis is the sole ground upon which we reverse Glover's conviction on counts 13-15, and is an alternate ground upon which we reverse his conviction on counts 5-7 and 10-12.

48

contractual obligations. The USDOT was powerless to "exercise authority" over either Granite or the defendants. The false statements made by the defendants concerned their compliance with the terms of their contract with Granite, a contract over which the USDOT neither had nor exercised any supervisory power. Consequently, the false statements concerned a matter outside the jurisdiction of the federal government.

The Government argues that, because the funds with which Granite was paid had originated with the federal government, any matters pertaining to the construction project necessarily fall under federal jurisdiction. This argument is unacceptable for several reasons. First, the Supreme Court explicitly stated in Rodgers that the key issue in determining whether a statement is within the government's jurisdiction is the authority of the agency to act. Generally speaking, a federal agency only has the authority to take action against the recipient of the federal funds—that is, the party with whom it has contracted. In this case, that would be the FDOT.

The fact that the FDOT may have contracted with private firms such as Granite, or that Granite in turn may have subcontracted with the defendants, does not somehow give the USDOT power over agreements between Granite and the defendants. Indeed, the Government's witnesses testified at trial that the FDOT,

49

not the USDOT, was responsible for overseeing Granite. If the USDOT was displeased with an agreement between Granite and the defendants, it lacked the power to compel either party to rescind or modify the agreement. The only thing it could do would be to pressure the FDOT, under the terms of the FDOT's contract with the USDOT, into pressuring Granite into taking some sort of action. This embarrassingly weak and indirect avenue of recourse demonstrates the USDOT's lack of authority, and hence lack of jurisdiction, over Granite and the defendants.

The Sixth Circuit has recognized the importance, even in the context of federally funded programs, of determining whether or not the federal agency actually has power over the specific transaction in which the false statements were made. In United States v. Lutz, 154 F.3d 581 (6th Cir. 1998), the defendant ran a loan origination company. She would fill out applications on behalf of potential borrowers and submit them to private banks in order to obtain HUD-backed loans for those borrowers. The applications required the defendant to certify that she had obtained the information necessary to fill them out through face-to-face meetings with her clients. The defendant never actually met with many of her clients, yet she falsely certified that she had.

The Sixth Circuit ultimately affirmed her conviction. In the course of its opinion, however, the court held that at the time the defendant submitted the

paperwork to the banks, the matter was not yet within HUD's jurisdiction, as there was nothing HUD could yet do regarding the application. The court explained,

> At the time [the defendant] submitted the forms to the lending institution certifying that she had held face-to-face interviews, HUD did not yet have jurisdiction because the final loan application package had not yet been submitted to it. <u>Furthermore, HUD had no authority over the lending institution at this point with regard to whether or not the institution would accept the loan</u>. Therefore, the matter was not within HUD's jurisdiction . . . .

154 F.3d at 586-87 (emphasis added).

We also note that if § 1001 were interpreted to prohibit any false statement to any private entity whose funds, in whole or in part, happened to originate with the federal government, the results would be shocking. To start with a simple example, any employee of either Granite or its subcontractors who may have padded his resume to obtain a job on the project would be guilty of a federal offense. After all, under the Government's theory, the road construction was under the jurisdiction of the federal government, and by lying on his resume that worker received a share of "federal funds" to which he otherwise would not have been entitled. Perhaps sharing that worker's federal prison cell would be the person who lied about his address to get a local library card in a town in which he does not reside that happened to receive some funds under Congress's library subsidization program.

51

Indeed, under the Government's theory, any teachers in inner-city public schools that receive federal subsidies who take sick days when they're really going to the beach can find themselves spending some quality time with a bright young Assistant United States Attorney. The Department of Justice can also pay a visit to the UPS driver who deliberately puts off delivering a package that the Government mailed second-day air until the third day. Perhaps the most shocking implication of the Government's interpretation of § 1001 is that anyone who lies on an admissions application to any of the thousands of educational institutions in this nation that receive federal funds or participate in a federal financial aid program—including public and private colleges, law schools, medical schools, and the like—may be considered a federal felon. All of this, without any notice to the individual that her statements are a violation of federal law.

While Congress may be constitutionally empowered to criminalize this broad range of conduct, we simply do not believe that it chose to do so, especially not through a statute such as § 1001. The Supreme Court's explanation of jurisdiction in <u>Rodgers</u> requires a reasonable, balanced interpretation of this law. Because a federal agency can exercise power directly over the recipient of its funds, the federal government clearly has jurisdiction over such actors and may prosecute them under § 1001. Because a federal agency's agreement with a

52

recipient of federal funds does not necessarily empower that agency to exercise authority over third parties with whom that recipient interacts, the agency lacks jurisdiction over those third parties and interactions. Under Rodgers, jurisdiction does not simply follow federal money wherever it may lead.

Notwithstanding relatively recent cases that suggest the contrary, our circuit precedent is consistent with this conclusion. Our earliest relevant case, Lowe v. United States, 141 F.2d 1005 (5th Cir. 1944) (Holmes, J.), addressed 18 U.S.C. § 80, the forerunner to § 1001. This law stated:

> [W]hoever shall knowingly and willfully . . . make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false [writing], knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States . . . [shall be punished].

75th Cong., 3d Sess., Ch. 69, Apr. 4, 1938, 52 Stat. 197. This statute is in all material respects identical to its current incarnation in 18 U.S.C. §§ 1001(a)(2), (3).[32] Since Lowe represents our earliest opinion on the meaning of this provision,

---

[32] For the purpose of comparison, 18 U.S.C. § 1001(a)(2), (3) provides:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> . . .
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing

53

we are bound to follow it even if it is contrary to our later opinions or interpretations. See Clark v. Housing Auth. of Alma, 971 F.2d 723, 726 n.4 (11th Cir. 1992) ("Where circuit authority is in conflict, the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc.").

In Lowe, the defendant worked for the Alabama Dry Dock & Shipbuilding Company. He was paid by the hour, and submitted false time sheets that misrepresented the number of hours he worked. He was prosecuted under § 1001 because, at the time, "the company was engaged in building ships under a contract with the United States Maritime Commission, an agency of the United States, providing that the company should make its payroll payments and should be directly reimbursed therefor by the Treasury of the United States." Lowe, 141 F.2d at 1006. This court reversed the defendant's conviction, holding:

> [T]he validity of the indictment depends upon whether the alleged fact that the United States reimbursed the company for its payroll payments was sufficient to make the alleged misrepresentation with respect to the payroll entry a matter within the jurisdiction of a department or agency of the United States. We think not.

---

the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be [punished].

54

Id. We further explained,

> [Defendant's] employment was derived from his private contract with a private corporation. His hours of work and rate of pay, and the control and supervision over the duties he performed, were matters within the exclusive dominion of his private employer. The misrepresentation as to the hours worked was made to an employee of the private corporation under an arrangement whereby the wages were to be paid by the corporation. Insofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any governmental agency of any kind. . . . . The contract for reimbursement of payroll payments . . . did not designate the payroll department of the company as an agency of the United States, nor did it place that department under the control or supervision of any such agency.

Id. We concluded, "[T]he mere allegation of the existence of the contract providing for reimbursement of payroll payments was not sufficient to make [the defendant's] alleged fraudulent misrepresentation to his employer an offense against the United States." Id.

Thus, Lowe was about the "jurisdiction" element of § 1001 (or, more specifically, 18 U.S.C. § 80, the predecessor to § 1001). The clear, indisputable holding of Lowe is that a misrepresentation made to a private company concerning a project that is the subject of a contract between that company and the federal government does not constitute a misrepresentation about a matter within the jurisdiction of the federal government.

55

Later cases have twisted this holding, instead construing <u>Lowe</u> as a <u>mens rea</u> case. For example, in <u>United States v. Beasley</u>, 550 F.2d 261, 273-74 (5th Cir. 1977), we held that <u>Lowe</u> supported the proposition that "false claims submitted to the state when the claimants knew that the state would rely on those claims for reimbursement from the federal government pursuant to a joint federal-state program fall within the federal false claims statute." Putting aside the issue of the type of <u>mens rea</u> necessary to support a § 1001 conviction, this is a grave mischaracterization of <u>Lowe</u>. <u>Lowe</u> never spoke to the defendant's state of mind, and did not ask whether the defendant was aware of the federal government's involvement. Indeed, because the shipyard was constructing ships for the federal government, according to federal specifications, it is quite likely that the defendant knew of the federal government's involvement.

As discussed above, <u>Lowe</u> focused squarely and exclusively on whether the false statement concerned a matter within the federal government's jurisdiction. The defendant's misstatements about his hours of work concerned his pay, a matter between him and his employer that we held was not within the jurisdiction of the federal government. Neither the fact that the shipyard may have been paying him with funds it received under its contract with the federal government, nor the fact that misrepresentations concerned a federal project, nor the fact that

the defendant's lies may have formed the basis of progress reports or work utilization summaries sent to the government, were sufficient to bring the matter within the federal government's jurisdiction.

One of our last cases to cite Lowe was United States v. Baker, 626 F.2d 512 (5th Cir. 1980). Baker accurately characterized Lowe's actual holding, recognizing that Lowe limited the range of matters which could properly be considered within the federal government's jurisdiction for purposes of § 1001. See id. at 515 n.6. Nevertheless, the Baker court upheld the defendant's § 1001 convictions for making false statements to the Dallas Housing Authority (the "DHA") because the "DHA was required to make quarterly reports to HUD [a federal agency], and HUD retained 'the ultimate authority to see that the federal funds (were) properly spent.'" Id. (quoting United States v. Stanford, 589 F.2d 285, 297 (7th Cir. 1978) (alteration in original)).

Notwithstanding Baker's attempt to distinguish Lowe, we believe the opinions are in conflict. It strains credulity to believe that a shipbuilder under contract with the federal government to build ships would not be required to submit progress reports, or that the federal government lacked "the ultimate authority" to ensure that it was actually getting what it was paying for. Indeed, the shipbuilder's claim to the federal government for reimbursement had to be based,

at least in part, on information concerning the shipbuilder's workers' hours. Put another way, it seems that the very factors Baker cited to distinguish itself from Lowe were actually present in Lowe. Thus, under our prior panel rule, we adhere to Lowe instead of Baker.[33]

While some later Supreme Court cases have required that the term "jurisdiction" be construed "broadly," see, e.g., Bryson v. United States, 396 U.S. 64, 70, 90 S. Ct. 355, 359, 24 L. Ed. 2d 264 (1969), such general statements are insufficient to allow us to deviate from the holding in Lowe. "We are not at liberty to disregarding binding case law that is so closely on point and that has only been [allegedly] weakened, rather than directly overruled, by the Supreme Court." Fla. League of Prof. Lobbyists, Inc. v. Meggs, 87 F.3d 457, 462 (11th Cir. 1996). "While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly

_____

[33] We find it particularly disturbing that one of our most frequently cited cases on this subject, United States v. Herring, 916 F.2d 1543 (11th Cir. 1990), does not even mention Lowe. In Herring, we upheld the conviction of a defendant who submitted to the Georgia Department of Labor an application for unemployment assistance that contained false statements about his work history. We stated, "[A] state agency's use of federal funds is generally sufficient to establish jurisdiction under section 1001." Id. at 1547. Several other circuits have adopted this approach. See, e.g., United States v. Shafer, 199 F.3d 826, 829 (6th Cir. 1999) ("Because the false statements in this case were made to a state agency that received federal support and was subject to federal regulation, the false statements made by [the Defendant] involve a matter that falls squarely within the jurisdiction of an agency or department of the United States."); United States v. Davis, 8 F.3d 923, 929 (2nd Cir. 1993) ("In situations in which a federal agency is overseeing a state agency, it is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction.").

on point." Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003). Because neither Lowe nor its central holding has never been overruled by the Supreme Court or this court sitting en banc, it remains good law. The fact that it is supported by solid policy and federalism considerations is merely an additional benefit.

Consequently, the Supreme Court's opinion in Rodgers, our own opinion in Lowe, and deeply troubling concerns over the otherwise unbridled reach of § 1001 compel us to conclude that the false statements made by Glover to Granite did not fall within the USDOT's jurisdiction. Thus, we must reverse Glover's convictions under Counts 5-7 and 10-15.

VI.

We reject the defendants' contentions that the district judge erred in conducting a joint trial. We similarly reject Glover's claim that the Government's indirect reference to his failure to testify prejudiced him and resulted in a denial of his Fifth Amendment right against self-incrimination or guarantee of due process. We reverse the Blankenships' and Tarand's money laundering convictions under counts 26-34 because their actions did not betray an intent to "conceal" the proceeds of their illegal activities. As a result, their convictions under count 3, for conspiring to engage in money laundering, is also reversed. For a variety of

reasons, we also reverse Glover's convictions under counts 5-7 and 10-15. The remaining convictions are affirmed.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and this matter is REMANDED for resentencing.

SO ORDERED.

BLACK, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court did not abuse its discretion when it denied Appellants' severance motions; therefore, I concur in that result. With respect to the money laundering and false statement convictions, I respectfully dissent.

## I.  MONEY LAUNDERING CONVICTIONS

To prove money laundering under § 1956(a)(1)(B)(i), commonly referred to as the concealment prong of the money laundering statute, *see, e.g.*, *United States v. Majors*, 196 F.3d 1206, 1211 & n.11 (11th Cir. 1999), we have held the Government must show:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

*United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002).  Appellants question the sufficiency of the evidence only as to the fourth element—intent to conceal.

There is no dispute that we review sufficiency of the evidence claims de novo, viewing the evidence in the light most favorable to the Government, with all

61

reasonable inferences and credibility choices made in the Government's favor. *United States v. McCarrick*, 294 F.3d 1286, 1289–90 (11th Cir. 2002). We will not reverse a conviction on the basis of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Christo*, 129 F.3d 578, 579 (11th Cir. 1997). The Government need not disprove every reasonable hypothesis of innocence and the jury is "'free to choose among reasonable constructions of the evidence.'" *Majors*, 196 F.3d at 1210 (quoting *United States v. Jones*, 913 F.2d 1552, 1557 (11th Cir. 1990)).

Although the majority correctly states the standard of review, it fails to apply it properly. Appellants presented a credible explanation for the financial transactions shown by the Government, but the jury was not required to accept Appellants' characterization of the evidence.[1] The evidence admitted at trial was that Randy Blankenship received thirteen checks made out to "H.J. Trucking" from Granite Construction. Randy Blankenship created an account under the name of "Randy Blankenship d/b/a H.J. Trucking" (the DBA account). These

---

[1] Indeed, Appellants' contention that the DBA account was set up per the bank's instruction, strictly speaking, is not inconsistent with the jury verdict. "Concealing the source of funds does not need to be the only goal of the pertinent transaction." *United States v. Abbell*, 271 F.3d 1286, 1298 n.10 (11th Cir. 2001).

checks, totaling $268,978.74, were deposited into the DBA account. Immediately upon deposit, Randy Blankenship wrote out a new check drawn on the DBA account and deposited that check into Tarand's account. All the proceeds, save $100, were transferred in this manner to the Tarand account.

This evidence was sufficient for a jury to conclude beyond a reasonable doubt that these transactions were designed to conceal from Granite that Tarand was the true beneficiary of the funds Granite thought it was paying to H.J. Trucking—i.e., to conceal the ownership and control of the proceeds. That this scheme ultimately failed is not determinative. *See United States v. Starke*, 62 F.3d 1374, 1384 (11th Cir. 1995) (concluding "that a money laundering transaction need not conceal the identity of the participants in the transaction," so long as "the transactions were designed to conceal the funds or the source of the funds").

The majority's concern that affirming the money laundering convictions would extend the money laundering statute to virtually all financial transactions involving the proceeds of unlawful activities is not warranted. The critical factor here is that the Blankenships deposited the funds, which were not payable to them, into an account with a false name, and then immediately turned around and redeposited the funds into their own account. This is not merely a case of "money

spending."[2]  *See Majors*, 196 F.3d at 1213.

Nor does the rule of lenity apply in this case.  There is no issue of how the statute should be read.  *See Moskal v. United States*, 498 U.S. 103, 108, 111 S. Ct. 461, 465 (1990) (observing that lenity is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute" (internal quotation marks omitted)).  Rather, we are presented with the clear cut question of whether the Government has provided sufficient evidence to establish concealment under the statute—i.e., a question pertaining to the jury's factual findings, not to the law.  It is this jury finding—supported by substantial evidence—the majority unnecessarily abrogates.  Accordingly, I would affirm.[3]

---

[2] I also note that at least two factors listed by the Court in *Majors* as probative of intent to conceal are arguably present in this case:  namely, the depositing of illegal profits in the bank account of a legitimate business, and the use of a putative third party (H.J. Trucking) to conceal the real owner of the proceeds.  *See Majors*, 196 F.3d at 1213 n.18.

[3] *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), upon which the majority places great reliance, is distinguishable.  In that case, funds were deposited from a government agency into an account designated "Douglas J. McGuire d/b/a W.G. Williams Enterprises."  *Id.* at 524–25.  McGuire did not, however, go on to transfer the funds to another account (unlike the Blankenships, who immediately transferred the funds to the Tarand account).  Rather, he either converted the funds in the DBA account directly into cash or used them to pay off his personal mortgage.  *Id.* at 525.  Accordingly, the Sixth Circuit found there was no evidence of a design to conceal the proceeds of illegal activity.  *Id.* at 528.

64

## II. FALSE STATEMENT CONVICTIONS

Only Glover challenges his convictions under 18 U.S.C. § 1001(a),[4] which prohibits making a false statement in any matter within the jurisdiction of the United States government. To obtain a conviction, the Government had to prove the following five elements: (1) the existence of a statement; (2) falsity; (3) jurisdiction; (4) materiality; and (5) specific intent to defraud. *United States v. Herring*, 916 F.2d 1543, 1546 (11th Cir. 1990). Here, Glover argues *only* that the Government failed to establish the third element—jurisdiction. The majority accepts this argument, but it also concludes that, with respect to the convictions involving equipment leases, the Government failed to establish the second element—falsity—as well. Accordingly, the majority reverses all of Glover's § 1001 convictions on jurisdictional grounds and some of them, in the alternative,

---

[4] The indictment charged Glover with "mak[ing] and us[ing] a false writing and document, knowing the same to contain materially false, fictitious and fraudulent statements and entries, in a matter within the jurisdiction of the United States Department of Transportation" and seeking "to create the false appearance that H.J. Trucking was performing and managing the work required under the subcontract between Granite and H.J. Trucking." Glover was convicted on Counts 5–7 and 10–12, which involved equipment leases between H.J. Trucking and other trucking firms, and Counts 13–15, which involved wage and hour records submitted by H.J. Trucking.

on falsity grounds too.[5]  Because I disagree with both this result and its rationales,

I dissent.  I would affirm all of Glover's § 1001 convictions.

A.    *Jurisdiction*

Glover, a subcontractor, submitted the false statements at issue in this case

to Granite, the general contractor.  These false statements involved either

(1) leases between H.J. Trucking and other trucking companies showing H.J.

Trucking controlled assets it did not,[6] or (2) certified payrolls submitted by H.J.

Trucking, claiming various drivers it employed were owner-operators when they

were not.[7]  Granite relied upon these statements when it certified to the state and

federal agencies involved that it was in compliance with the DBE requirement.

---

[5] All of Glover's § 1001 convictions are reversed on jurisdictional grounds, and the convictions on Counts 5–7 and 10–12 are also reversed on falsity grounds.

[6] After Granite had subcontracted with H.J. Trucking, inspectors noticed that both Tarand and J.D. Miller trucks were showing up at the job site bearing H.J. Trucking insignia.  The inspectors refused to let these trucks be used unless it could be shown they were leased to H.J. Trucking.  Accordingly, Tammy Blankenship created leases to satisfy the inspectors, on the off chance they might again check truck ownership.  Significantly, these same leases were also used to convince Granite that H.J. Trucking was in compliance with the 51 percent requirement.

[7] To show that it was following federal wage tables, H.J. Trucking submitted weekly "certified payrolls" to Granite listing the H.J. Trucking employees who had worked on the project that week, the hours they worked, and the wages they were paid.  Granite in turn forwarded these certified payrolls to the Florida Department of Transportation.  Each of these payrolls identified truck drivers as "owner-operators" when, in actuality, the drivers neither worked for H.J. Trucking nor were owner operators; rather, they worked for either Tarand or one of Miller's companies.

66

On appeal, Glover argues there is an insufficient nexus between the federal government's jurisdiction and these false statements.[8]

The majority concludes § 1001's jurisdictional requirement is not satisfied for three reasons: (1) this Court's decision in *Herring* is inapplicable; (2) this Court's decision in *Lowe v. United States*, 141 F.2d 1005 (5th Cir. 1944), controls; and (3) the Government failed to establish the federal government supervised the federal funds at issue. I disagree with each of these conclusions.

1. Herring *Requires Affirmance*

The majority reaches the result it does because it concludes *Herring* and other cases from this Circuit are inapplicable. In *Herring*, this Court held § 1001's jurisdictional requirement was satisfied where the defendant made a false statement to a state agency that received federal funds. 916 F.2d at 1546–47. In reaching this decision, this Court noted that, under § 1001, the false statement does not need to be presented directly to a federal agency; rather, it is sufficient that the false statement is presented to a state agency, which in turn presents it to a

---

[8] In effect, Glover is challenging the sufficiency of the evidence with respect to jurisdiction—the third element. *See Alikhani v. United States*, 200 F.3d 732, 735 (11th Cir. 2000). In reviewing a conviction for sufficiency of the evidence, this Court "examine[s] the evidence de novo in the light most favorable to the government, to determine whether a reasonable jury could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged." *United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998).

federal agency. *Id.* at 1547. This Court also noted federal funds do not actually have to be used to pay the person making the false statement. *Id.* Indeed, this Court observed the "*state agency's use of federal funds is generally sufficient to establish jurisdiction under section 1001.*" *Id.* (emphasis added).

Glover argues *Herring* is inapplicable, given that this case contains an extra link in the chain—i.e., Granite—between him and the federal agency.[9] I see, however, no tangible difference. Glover knew he had to comply with the 51 percent DBE requirement, which stemmed from a federally-funded program. Indeed, it was his stated intention to comply that brought his company the trucking contract in the first place. Just as the defendant in *Herring* should have expected the state agency in that case to rely upon his false statement that he was unemployed when, in fact, he was working, *id.* at 1545, so too should Glover have expected both Granite and the state of Florida to rely upon the false statements he made concerning the DBE program, *see id.* at 1546–48; *see also United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985) ("It is undisputed that . . . the false statement need not be presented directly to an agency of the United States or that

---

[9] In *Herring* the chain of reliance upon the false statement consisted of three links, including the source of the false statement: (1) the defendant; (2) the state agency; and (3) the federal agency. 916 F.2d at 1546–47. Here, the chain contains four links: (1) Glover, who was a subcontractor; (2) Granite, the general contractor; (3) the state agency; and (4) the federal agency.

federal funds actually be used to pay the claimant."); *United States v. Baker*, 626

F.2d 512, 514–15 & nn. 5–6 (5th Cir. 1980) (holding that jurisdiction exists if the

federal agency retains authority to ensure federal funds are properly spent);[10]

*United States v. Beasley*, 550 F.2d 261, 273–74 (5th Cir. 1977) (holding that

jurisdiction exists where the defendant knows of the federal involvement).

Accordingly, I would affirm, based on *Herring* et al.

> 2.     Lowe

The majority does not apply *Herring* because it concludes *Lowe* controls.  In

my view, there are at least three significant problems with this conclusion.  First,

the facts in *Lowe* are quite distinct from the facts in this case, precluding the

conclusion *Lowe* controls.  Second, other cases from this Circuit have

distinguished *Lowe*.  Third, the majority cites clear and relevant Supreme Court

authority, which, when followed, leads to the opposite result.

> > a.     Lowe*'s Facts Are Distinct*

*Lowe* involved a defendant that worked for a shipbuilding company on an

hourly basis, who was charged with making a false statement regarding a "matter

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

within the jurisdiction of a department or agency of the United States." 141 F.2d at 1006. The indictment alleged only the following facts: (1) the shipbuilding company had a contract with the U.S. Maritime Commission to build ships; (2) this contract stipulated that the company should make its own payroll payments, but that those payroll payments would be reimbursed by the U.S. Treasury; and (3) Lowe falsely represented to the shipbuilding company's payroll department that he had worked eight hours when he had not. *Id.*

Following his plea of nolo contendere, the defendant appealed, questioning "whether the alleged fact that the United States reimbursed the company for its payroll payments was sufficient to make the alleged misrepresentation with respect to the payroll entry a matter within the jurisdiction of a department or agency of the United States." *Id.* In a short, six-paragraph opinion, this Court concluded jurisdiction did not exist under the facts alleged in the indictment. *Id.* In reaching this conclusion, this Court emphasized there was no indication the company's payroll department had been placed "under the control or supervision of [a federal agency]." *Id.* Indeed, Judge Waller even went so far as to note in a special concurrence that the conviction would have been *affirmed* if the indictment had alleged the U.S. Treasury's reimbursement was conditioned "upon [its] *receipt and checking* of the payrolls upon which payments had been made to the

70

workmen." *Id.* at 1006–07 (Waller, J., concurring) (emphasis added).

In summary, *Lowe* at most stands for the proposition that, to implicate jurisdiction, an indictment must do more than merely allege receipt of federal funds. *See id.* (Waller, J., concurring) (observing that jurisdiction would exist if the federal agency supervised the recipient of the funds). In this case, additional facts are clearly present. Part II.A.2 explains that the evidence demonstrates the federal government supervised the federal funds at issue in this case. Therefore, the only question that remains (and which is answered in Part II.A.2) is whether this supervision was sufficient to satisfy § 1001's jurisdictional requirement. *Lowe*, however, is of no help in this endeavor, as the indictment there contained no allegations whatsoever concerning supervision. *See id.*

> b.      *Eleventh Circuit Cases Have Distinguished* Lowe

As *Lowe* simply stood for the proposition that receipt of federal funds was not by itself sufficient to trigger jurisdiction, it remained for subsequent panels of this Court to determine what additional fact or facts had to be present for jurisdiction to exist.

A clear body of law gradually emerged. In 1976, this Court held jurisdiction exists where the defendant knows of the federal government's

connection to the funding at issue.  *United States v. Lange*, 528 F.2d 1280, 1287

n.11 (5th Cir. 1976) (distinguishing *Lowe*).  This Court applied the same reasoning

in a second case in 1977.  *See Beasley*, 550 F.2d at 273–74 (holding that

jurisdiction exists where the defendant submits false claims to the state, knowing

the state will rely on them to seek reimbursement from the federal government).

Then, in 1980, we clarified that, even if the defendant has no knowledge of federal

involvement, jurisdiction still exists if it is clear the federal government retained

authority to ensure federal funds are properly spent.  *See Baker*, 626 F.2d at 515

n.6:

> [S]ome courts have expressed a reluctance to sustain a conviction
> under § 1001 when the false statements were submitted to a private
> employer under government contract, and when the defendant had no
> knowledge of federal involvement.  *See Lowe v. United States*, 141
> F.2d 1005 (5th Cir. 1944).  These cases are clearly distinguishable
> from the case we consider today since in [cases like] *Lowe* it was not
> apparent whether the matters involving private contractors were
> "within the jurisdiction of a federal department or agency," while in
> the case at hand agency jurisdiction is clear.  [The local agency] was
> required to make quarterly reports to [the federal agency], and [the
> latter] retained the ultimate authority to see that the federal funds
> were properly spent.

(some citations and internal quotations marks omitted).

Not only was the law relating to whether jurisdiction existed clear in this

Circuit prior to the majority's contribution, but it also was in accord with that of

72

*every other Circuit* that had cited *Lowe*—all of which distinguished that case. *See*

*United States v. Stanford*, 589 F.2d 285, 297 (7th Cir. 1978) (adopting, in effect,

this Court's conclusions in *Lange* and *Beasley*); *United States v. Candella*, 487

F.2d 1223, 1226–27 (2d Cir. 1973) (same); *Eberling v. United States*, 248 F.2d

429, 435 (8th Cir. 1957) (same); *United States v. Gibson*, 881 F.2d 318, 322–23

(6th Cir. 1989) (adopting, in effect, this Court's conclusions in *Baker*); *United*

*States v. Montoya*, 716 F.2d 1340, 1343–45 (10th Cir. 1983) (same); *Nye & Nissen*

*v. United States*, 168 F.2d 846, 850–51 (9th Cir. 1948) (same).

The majority's opinion alters this body of well-settled law by adding facts to

the indictment in *Lowe* that this Court itself acknowledged were not present.[11] The

majority observes:

> It strains credulity to believe that a shipbuilder under contract with
> the federal government to build ships would not be required to submit
> progress reports, or that the federal government lacked the "ultimate
> authority" to ensure that it was actually getting what it paying for.

(Opinion at 57.) In effect, the majority is saying that—because (1) federal

---

[11] Given that *Lowe* involved the sufficiency of facts alleged in an indictment, I believe it is improper for the majority to speculate about what facts were "quite likely," (Opinion at 56), "may have" existed, (*id.* at 57), or the lack of which "strains credulity," (*id.*).

supervision must have been present in *Lowe*, and (2) this Court nevertheless held there was no jurisdiction—the existence of federal supervision here is insufficient to trigger jurisdiction for purposes of § 1001.[12]

As this Court acknowledged in *Lowe*, however, the only issue there was whether alleging receipt of federal funds was sufficient to trigger jurisdiction. 141 F.2d at 1006:

> [T]he validity of the indictment depends upon whether the alleged fact that the United States reimbursed the company for its payroll payments was sufficient to make the alleged misrepresentation with respect to the payroll entry a matter within the jurisdiction of a department or agency of the United States.

*See also id.* (explaining there was no indication the shipbuilding company was supervised by a federal agency); *id.* at 1006–07 (Waller, J., concurring) (noting that jurisdiction would have existed if some degree of federal supervision had been present). Thus, the majority's assumption that some degree of supervision was present is entirely without foundation. It is also contrary to how this and every other Circuit has approached *Lowe* up until this instant.

---

[12] Note that this result is contrary to this Court's holding in *Baker* that federal supervision satisfies § 1001's jurisdictional requirement. 626 F.2d at 514–15 nn.5–6.

## c.  *Relevant Supreme Court Authority*

*Lowe* acknowledges no authority for the interpretation of § 1001's jurisdictional requirement.[13]  Since *Lowe*, the Supreme Court has provided authority holding that § 1001's jurisdictional requirement is to be interpreted broadly.  *See United States v. Rodgers*, 466 U.S. 475, 479, 904 S. Ct. 1942, 1946 (1984):

> "Jurisdiction" is not defined in the statute. We therefore start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.  The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department.  Thus, Webster's Third New International Dictionary 1227 (1976) broadly defines "jurisdiction" as, among other things, "the limits or territory within which any particular power may be exercised: sphere of authority."  *A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation.  Understood in this way, the phrase "within the jurisdiction" merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body.*

(emphasis added; most citations and internal quotation marks omitted); *Bryson v. United States*, 396 U.S. 64, 70–71, 90 S. Ct. 355, 359 (1969):

> Because there is a valid legislative interest in protecting the integrity of official inquiries, we think the term "jurisdiction" should not be

---

[13] *Lowe* occupies little more than a single page in the federal reporter and is utterly devoid of citation to authority.  *See* 141 F.2d at 1006–07.  Indeed, the only citation is to the statute at issue, 18 U.S.C. § 80, which preceded § 1001.

given a narrow or technical meaning for purposes of § 1001. A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001.

(footnotes and citations omitted).

In my view, this Court's decisions in *Herring* et al. are in accord with the Supreme Court's decisions in *Rodgers* and *Bryson*, while the majority's opinion in this case is not. The Supreme Court's instructions were to read § 1001's jurisdictional requirement broadly, yet the majority reads it narrowly.[14]

### 3. *The Federal Government Supervised the Federal Funds*

Once one concludes *Herring* and *Baker* constitute binding authority, and, by extension, that jurisdiction exists if there is federal supervision of the federal funds at issue, the question becomes whether there was federal supervision in this case. Unlike the majority, (Opinion at 49–50), I believe there was supervision here.

In support of its conclusion that there was no supervision, the majority relies on *United States v. Lutz*, 154 F.3d 581 (6th Cir. 1998). Lutz ran a loan origination

---

[14] In my view, there are only two possibilities here. Either the majority is wrong about *Lowe*, which I think it is, or the majority is correct, and the Supreme Court has overruled *Lowe* sub silentio. With respect to the second possibility, an argument could be made that, at the time *Lowe* was decided, the Supreme Court had not yet established a framework for analyzing the jurisdictional requirement, although it has done so since. Therefore, the argument would go, *Lowe* was overruled sub silentio because it did not follow that framework. Given, however, that the majority's conclusions are contrary to those of the other Circuits that have cited *Lowe*, I believe the first possibility to be the case.

company, where she filled out applications on behalf of potential borrowers and submitted them to private banks in order to obtain HUD-backed loans for those borrowers. *Id.* at 585. In these applications, Lutz certified she had met face-to-face with her clients when she had not actually done so. *Id.* She was convicted of violating § 1001. *Id.* at 586. On appeal, Lutz made two relevant arguments: (1) the statute of limitations had run; and (2) § 1001's jurisdictional requirement was not met. *Id.* at 586.

With respect to her first argument, Lutz contended that, since (1) the crime was complete when she "submitted the initial application forms to the [bank]," (2) the statute of limitations was five years, (3) the date on the forms was more than five years ago, and (4) no evidence was presented at trial indicating when the forms were actually submitted, the statute of limitations had run. *Id.*

With respect to her second argument, Lutz contended there was no evidence the forms had ever been submitted to HUD; therefore, § 1001's jurisdictional requirement was not met. *Id.* at 587.

The Sixth Circuit rejected both arguments. Somewhat confusingly, it concluded that while there was no jurisdiction for statute of limitations purposes until HUD actually received the forms, *§ 1001's jurisdictional requirement was*

*satisfied even though the forms never reached HUD. Id.* at 586–87.

Although it does not so specify, the majority focuses entirely on the Sixth

Circuit's treatment of Lutz's first argument—i.e., her argument concerning the

statute of limitations.[15] In my view, the majority's discussion of *Lutz* is misleading

because it completely fails to note that Lutz's second argument concerned

§ 1001's jurisdictional requirement, and the Sixth Circuit held, after addressing

that argument at length, that the requirement was satisfied:

> *There is no implicit requirement that the [false] statements be made*
> *directly to, or even be received by, the federal department or agency.*
> False statements made in any matter within the agency's jurisdiction
> are within the scope of § 1001, and courts have upheld § 1001
> convictions for false statements made to private entities receiving
> federal funds or subject to federal regulation or supervision.
>
> *HUD had supervisory authority over the lending institution*
> *with regard to the loans at issue.* HUD had various requirements and
> rules that the lending institutions and loan originators were expected
> to comply with in accepting loans for the program, including the
> requirement that face-to-face interviews occur. *When Lutz submitted*
> *the final loan packages to HUD, which were approved by the lending*

---

[15] The majority even quotes from the Sixth Circuit's discussion of the statute of
limitations:
> "At the time [the defendant] submitted the forms . . . HUD did not have
> jurisdiction because the final loan application package had not been submitted to
> it. Furthermore, HUD had no authority over the lending institution at this point
> with regard to whether or not the institution would accept the loan. Therefore, the
> matter was not within HUD's jurisdiction."

(Opinion at 51 (quoting *Lutz*, 154 F.3d at 586–87)).

> *institution in part on the basis of the false certification, this was*
> *sufficient to constitute a false statement in violation of § 1001.*

154 F.3d at 587 (emphasis added; citations and quotation marks omitted).[16]

Significantly, the Sixth Circuit went on to affirm the § 1001 conviction. *Id.* at 591. Accordingly, I disagree with the majority that *Lutz* supports the result it reaches.

Instead of applying the Sixth Circuit's decision in *Lutz*, I would apply this Court's decision in *Baker*. In *Baker*, this Court held "supervision" exists where (1) the nonfederal entity to which the false statements were initially made was required to submit reports to the federal agency, and (2) the federal agency retained authority to ensure federal funds were properly spent. *See Baker*, 626 F.2d at 515 n.6; *see also Herring*, 916 F.2d at 1546–47 (finding jurisdiction where the nonfederal entity had to comply with a federal statute before it could receive any funds); *cf.* Webster's Third New International Dictionary 2296 (1976) (defining "supervision" as "direction, inspection, and critical evaluation: oversight").

---

[16] The Sixth Circuit's analysis in *Lutz* is consistent with how *all* of the Circuits—including this one—have handled *Lowe* up until the majority's opinion in this case. *See supra* Part II.A.1.b (explaining that § 1001's jurisdictional requirement is satisfied where either (1) the federal government supervised the federal funds at issue, or (2) the defendant had knowledge of federal involvement). Significantly, the majority fails to note this.

During the trial in this case, witnesses testified as follows: (1) the Federal Highway Administration and the Florida Department of Transportation agreed that Florida would receive federal funds, provided all federal guidelines were met; (2) Florida was required, prior to receiving funds, to certify all such guidelines would be met; (3) if Florida did not comply with the federal guidelines, it would lose federal funds; and (4) one of the federal guidelines that Florida had to comply with was the DBE requirement. Based on this evidence, I would hold the federal agency in this case supervised the federal funds at issue.

Accordingly, because I believe supervision was present here, I would affirm.

B.    *Falsity*

The majority also reverses Glover's convictions on Counts 5–7 and 10–12 because it concludes the underlying equipment leases[17] cannot, as a matter of law, constitute false statements for purposes of § 1001. In its analysis, the majority correctly notes that many of our sister Circuits have upheld convictions pursuant to § 1001 where the defendants "made promises or guarantees concerning their future actions that, at the time they made those promises, they had no intention of

_____

[17] For an explanation of why these leases were created, see *supra* note 6.

80

carrying out." (Opinion at 40.) It further notes many of these cases involved false guarantees made on applications for government benefits—i.e., instances where the defendants qualified for a federal benefit only because they promised in their applications to perform some action in the future they had no intention of actually performing. (*Id.* at 40-41.) To this point, I agree with the majority.

The majority goes on to conclude, however, that, because contracts are not applications for benefits, the former cannot, as a matter of law, constitute false statements for purposes of the statute. In support of this conclusion, the opinion explains that (1) contracts only serve to establish a legal relationship among the parties involved, (2) breach is not illegal, and (3) "efficient" breach is often even socially desirable. (Opinion at 41–43.) In my view, this portion of the majority's analysis is beside the point. Significantly, it is not just the equipment leases, standing alone, that are at issue here.

The Government did not prosecute Glover merely because his company made a contractual promise it did not intend to keep. Rather, the Government prosecuted him because he took the *additional step* of presenting his company's contractual promises in writing to Granite—to demonstrate his purported compliance with the Federal Department of Transportation's DBE requirement. Significantly, at the time these presentations were made, Glover knew the leases

did not reflect the reality of the situation, and he knew Granite would rely on them.[18] Moreover, if Granite had not been misled into believing Glover's company was in compliance, the latter would not have been participating in the project. As far I am concerned, the analysis here need go no further. I see no tangible difference between the equipment leases in this case and false statements incorporated into applications for government benefits. In my view, both fall within § 1001's scope because both involve defendants lying to obtain government benefits to which they are not entitled.

One additional aspect of the majority's opinion troubles me: the falsity issue is being raised sua sponte. As the issue appears to be a question of first

---

[18] The majority claims there is a need to avoid judicially creating a national "false contract" law, under which merely entering into a contract absent an intention of performing might expose a person to federal prosecution. (*See* Opinion at 46.) I must admit this concern perplexes me, as a person cannot be convicted under § 1001 unless the Government proves all five elements of the crime—including, significantly, specific intent. *See Herring*, 916 F.2d at 1547. To reiterate, it is not entering into a contract absent an intent to perform that triggers § 1001's applicability. Rather, what triggers § 1001's applicability is taking the additional step of representing to the government that such a contract reflects reality, knowing full well it does not. *See United States v. Swearingen*, 858 F.2d 1555, 1557–58 (11th Cir. 1988) (concluding that presenting sham transactions as valid constitutes making a false statement). In the first instance, there is no specific intent to mislead the government. In the second, there is. Thus, it seems the majority has committed the logical error of importing a concern addressed by one element—specific intent—into its analysis of another—whether there was a false statement. *See Baker*, 626 F.2d at 516 (noting that the specific intent requirement "serves to insure against punishing one who has committed no culpable act"). In my view, if there is any concern regarding "innocent" persons potentially being swept up into the statute's scope, that concern should be addressed by analyzing whether there was specific intent to mislead—not whether there was a false statement.

impression in this Circuit, I am somewhat reluctant to address it, given that it has

not been briefed and argued in the adversarial context.[19] I am also concerned

because—apart from its conclusion that contracts and applications simply *must* be

treated differently for purposes of § 1001—the majority's analysis hinges entirely

on its application of the Supreme Court's decision in *Williams v. United States*,

458 U.S. 279, 102 S. Ct. 3088 (1982), which is questionably relevant in that this

Court previously opted to apply it narrowly in *United States v. Swearingen*, 858

F.2d 1555 (11th Cir. 1988) (per curiam).

The defendant in *Williams* was convicted under 18 U.S.C. § 1014, which

prohibits making a "false statement" to a federally insured bank. 458 U.S. at

280–82, 102 S. Ct. at 3089–90. The defendant had been depositing checks drawn

on one account into a second account, knowing there were insufficient funds in the

first account to cover those checks. *Id.* The Supreme Court overturned the

conviction, concluding a check could not be a "false statement," since,

---

[19] The majority focuses exclusively on § 1001(a)(3), which is concerned with whether there was a false writing. Had this issue had been raised by the parties, I would have wanted to ask them whether they thought § 1001(a)(2) might also apply, as that provision requires merely that there have been a "false . . . statement or representation" and makes no mention of a "writing." After reviewing the indictment and the record, I am not, at this stage, comfortable concluding the latter subsection is inapplicable.

"technically speaking, a check is not a factual assertion . . . and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284, 102 S. Ct. at 3091.

In *Swearingen*, this Court considered whether *Williams* applied in a factual context not involving the presentation of an overdrawn check and concluded it did not. *Swearingen* involved two automobile dealers who took turns presenting their bank with drafts drawn on the other's dealership. *Id.* at 1556. Each such draft represented that one dealer had purchased a car from the other, and that he would pay for it by honoring the draft. *Id.* In actuality, no cars had been sold, but, since the bank was convinced otherwise, the dealers were able to maintain artificially inflated balances and receive interest-free credit. *Id.* One of the dealers was convicted of violating 18 U.S.C. § 1344(a)(2), which required the Government to prove—inter alia—that he had made false representations. *Id.* at 1555–56. On appeal, the dealer cited *Williams* and argued that, because the Supreme Court had held checks could not be false statements, the drafts at issue in his case could not be considered false statements either. *Id.* at 1557. This Court soundly rejected the dealers' argument:

> [T]he [dealers] knew that the Bank believed that the . . . drafts represented actual, legitimate sales of vehicles, and that [they] used that perception to deceive the Bank in order to obtain an immediate credit on non-existent sales. Accordingly, through the [sight] drafts involved in this case the [dealers] made false factual assertions with the specific intent to defraud the Bank.

*Id.*

In my view, the equipment leases in this case performed the same function as the drafts in *Swearingen.  See id.* at 1558 (characterizing the "sales" described in the drafts as "simply 'paper' transactions with no purpose other than to obtain interest-free financing from the Bank").  They should thus be deemed false statements too.[20]

### III.  CONCLUSION

For the reasons stated, I would affirm the money laundering and false statement convictions.

---

[20] The majority declines to apply *Swearingen* on the ground that the drafts at issue in that case involved false statements of past fact, where the leases at issue in this case involve only contractual promises.  (Opinion at 46 n.30.)  I am not persuaded because, as already noted, the leases in this case were presented to Granite as indicative of reality—specifically, that Glover controlled the assets he claimed to—when they were not.  *See supra* note 6 and accompanying text.