[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13372

_____

D.C. Docket No. 02-00080-CV-5-SPM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 20, 2007
THOMAS K. KAHN
CLERK

THE COUGAR AGRICULTURAL SERVICES COMPANY,
INC., a Georgia corporation,
f.k.a. AGRICULTURAL SERVICES AND INVESTMENTS, INC.,
f.k.a. F&W Agriservices, Inc.,

Plaintiff-Counter-
Defendant-Appellee,

versus

BAGGETT BROTHERS FARM, INC., LAZORTH BAGGETT,
a.k.a. L. N. Baggett, EVELYN BAGGETT, BILLY BAGGETT,
a.k.a. Billy B. Baggett, ADA MAE BAGGETT, BOBBY GEORGE
BAGGETT, a.k.a. Bobby G. Baggett,

Defendants-Counter-
Claimants-Appellants,

LINDA BAGGETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 20, 2007)
**(As Amended November 15, 2007)**

Before CARNES, WILSON and HILL, Circuit Judges.

PER CURIAM:

## I.

In February 2002, the Cougar Agricultural Services Company, Inc. (CASC)[1] filed a two-count complaint against corporate defendant Baggett Brothers Farm, Inc. (BBFI)[2], its three shareholders, as individuals, brothers Lazorth Baggett, Billy Baggett, and Bobby Baggett (Baggetts), and their respective wives, on an open farm account over a four-year period (1997-2001), for damages in the amount of $514,051.38, plus interest since December 31, 2001 (count one). It also sought to foreclose a security agreement for a deficiency judgment against BBFI and the Baggetts, including attorneys' fees (count two).[3]

---

[1] CASC was formerly known as Agricultural Services and Investments, Inc. (ASI), which was formerly known as F & W Agriservices, Inc. (F&W). Its parent company is Agricultural Services and Investments, Inc. - Global (ASI Global).

[2] Bobby Baggett is the President of BBFI. Billy and Lazorth Baggett are Vice-Presidents of the corporation. None of the three brothers can read and/or write. Each are farmers, over sixty years of age. Together they have been raising cotton, peanuts, corn, soybean and wheat crops for decades. Billy's wife, Ada Mae Baggett, is the Chief Executive Officer and Secretary of BBFI, responsible for maintaining BBFI records and managing all corporate financial transactions from a home office. Although named as individual defendants, Linda and Evelyn Baggett do not participate in the corporation or the farming operation.

[3] A primary affirmative defense of the Baggetts was that any indebtedness owed on the open account was owed by BBFI in its corporate capacity and not the individual Baggetts themselves. The Baggetts found the complaint to be "so vague or ambiguous" under Fed.R.Civ.P. 12(e) that they could not reasonably frame a responsive pleading. They filed a motion for more definite statement. CASC's response to the motion for more definite statement reaffirmed that the complaint was intended against all defendants, both jointly and severally. The

The Baggetts counterclaimed for breach of the oral, open farm account agreement; for intentional infliction of emotional distress and for reformation of the security agreement.[4]  BBFI counterclaimed for reformation of the security agreement; breach of the oral, open farm account agreement; and breach of its three-year lease agreement with CASC, formerly known as Agricultural Services and Investments, Inc. (ASI).  *See* note 1 *supra*.

In response to CASC's motion for summary judgment, the district court dismissed the Baggetts' claim for intentional infliction of emotional distress.  A two-day bench trial was held on all remaining claims.

The district court found BBFI liable for $448,038.58 in debts incurred on the oral, open farm account from April 11, 1997, through March 10, 2001, including interest of $10,583.18 thereon; it pierced the corporate veil of BBFI, and, in addition, found the Baggetts individually liable; it found the three-year lease agreement between BBFI and CASC to be a nullity, and consequently unenforceable; and finally, the district court foreclosed the security agreement, finding that CASC retained a security interest in the collateral.  This appeal

district court denied the Baggetts' motion.

[4] By this counterclaim, the Baggetts wanted to limit the secured interest to $212,130.78, to be secured by the 1997 and 1998 growing season's crop revenue, and certain specified farming equipment.

follows.

## II.

CASC is in the business of financing farmers at the beginning of crop years, with the expectation that, when the crops are harvested, the crop proceeds will be used to repay CASC its advances, with interest. Since the mid-1980's, CASC, through its contact person, Dennis Barrentine (Barrentine), financed the Baggetts' farming operations and also provided advisory, supply, marketing, ginning and storage farm services, to the Baggetts and BBFI.[5]

The relationship between Barrentine and the Baggetts for the most part was a friendly and trusting one, based upon a virtual handshake and oral representations made by both sides.[6] On average, approximately $900,000 per year was required for each planting season.[7] There were no due dates for these advances. It was understood that the loans would be repaid from crop revenues, crop insurance proceeds, and certain government crop subsidy payments. As the

---

[5] Barrentine served as president of CASC from 1994 to 2001.

[6] Barrentine believed that if he could obtain and hold the Baggetts' trust, other farmers in the area would follow their lead, and he would be able "to grow his farmers" accordingly.

[7] These farm operating expense monies were used by BBFI to buy seeds, goods, services, insurance, farm equipment, pest control, to refurbish farm equipment, and to make land lease payments to the Baggetts. *See* note 10 *infra*.

4

monies came in, they were paid to CASC. For the most part, this informal arrangement worked flawlessly for seventeen years.

Twice, this traditional arrangement was reduced to writing. On February 5, 1998, the Baggetts and BBFI executed a promissory note, mortgage, security agreement and financing statement with CASC in the amount of $212,130.78, the amount due to be repaid when the 1997 and 1998 crops were sold. The agreement was signed both by the corporation and by the Baggetts in their individual capacities. It secured the repayment of $212,130.78, "as evidenced by note or notes of even date herewith." The printed security agreement continued with the language "and also to secure any other indebtedness or liability of the Baggetts to CASC direct or indirect, absolute or contingent, due or to be come due, now existing or thereafter arising, including all future advances or loans . . . ."[8]

Barrentine became aware of an organization in Tortola, British Virgin Islands, named the Global Islamic Subfund (described in this appeal as the Islamic Lease Fund or ILF) which was interested in buying land lease contracts in the United States in exchange for a promise by the seller that it would repurchase the

_____

[8] Ada Mae Baggett testified that she believed the security agreement was securing only the $212,130.00 note and not any after-acquired account loans (such as attorneys' fees generated by the present action). Barrentine also testified that, at the time he signed the security agreement, he believed it also only secured the $212,130.00 note itemized therein. He did not testify that he thought it secured anything else, such as after-acquired account loans.

agreements later at a higher price. The ILF would net a profit in the form of a capital gain. It would not be in the form of interest income. Interest income was culturally forbidden to the ILF.

When this alternative offshore source of funding was discovered, the Baggetts' traditional informal arrangement was reduced to writing a second time.[9] On January 16, 1999, Barrentine, on behalf of CASC, and the Baggetts, on behalf of BBFI, executed a three-year lease agreement.[10] Under the terms of the written lease agreement, BBFI would receive three lump sum payments of $832,458 per year, the first of which was due sixteen (16) days after the date the lease was executed. In return, they agreed to lease their land, labor and equipment to CASC.

Thereafter, CASC would obtain the funds necessary to pay the Baggetts' three-year leasehold interest by selling (or discounting) the Baggetts' lease to the ILF. Then, when CASC sold the crops grown on the land it had leased from the Baggetts, CASC would use the money generated from crop revenue to repurchase the lease agreements from the ILF.

---

[9] Ironically, the need for alternative financing apparently arose due to the fact that Barrentine had been so successful in "growing his farmers," and that this, in turn, had generated a cash flow problem for CASC.

[10] Both BBFI and the Baggetts can be construed to be parties to the lease agreement because, although the brothers owned the land outright as individuals, BBFI leased the land from the brothers and as such, had a right to all revenues generated by crop proceeds. BBFI was the owner of all farm equipment.

When CASC sold, with a buy-back provision, the lease contract to the ILF, the sale made ILF the legal holder of rights to crops grown on the Baggetts' land. Later, ILF would net a capital gain profit, and, at the same time, avoid culturally forbidden interest income, as the buy-back prices of the lease agreements paid to ILF were greater than the amount that CASC had initially received from ILF to honor the terms of the lease agreement. There is ample written evidence in the record to reflect that the Baggetts' lease was assigned to ILF and then sold back to CASC.[11]

As the Baggetts were entitled to three fixed annual payments of $832,458.00 each, regardless of how successful a CASC crop season was, this lease arrangement was beneficial to the Baggetts as it transferred a great amount of risk from them to CASC.[12] Other than the payments made on the open account, *see* note 12 *supra*, CASC never made a lease payment to BBFI.[13]

---

[11] An exhibit in the record indicates that the lease was assigned by CASC on December 22, 1999, to the Global Islamic Subfund, Tortola, British Virgin Islands.

[12] Ada Mae Baggett testified that she trustingly believed that loan payments she received were not payments made on the open account, but installment payments made on the annual lease obligations, notwithstanding that the lease agreement contracted for three annual lump sum payments of $832,458.00 each. Mae Baggett testified that, although she was the only one of the Baggetts that could read and write, she relied on Barrentine to keep financial records of any net balance due, stating "we depended on them for an amount."

[13] There is evidence in the record to suggest that CASC made lease payments to other farmers in the area operating under this alternative method of financing through the execution of similar leasehold interests.

Record evidence reflects, however, that Barrentine, for CASC, did receive monies from ILF, earmarked for the Baggetts' benefit, in the amount of at least one annual payment of $832,458.00. Instead of paying the Baggetts the money owed them by CASC, he put these funds into a separate account entitled the "Linton Seed account."

Barrentine told Brent Searle, his successor at CASC, that the money had in fact been paid to the Baggetts.[14] Barrentine stated that he simply used the ILF monies due the Baggetts for "other business needs at CASC." He further testified that CASC's failure to make the first lease payment to BBFI could merely be characterized as "a non-implementation of the lease."[15] The district court held accordingly. After multiple unsuccessful attempts at mediation, this appeal is now before us.

### III. [16]

There are five issues presented on appeal:

---

[14] Barrentine was replaced in 2001. Barrentine's successor at CASC, Brent Searle, testified in his deposition that he believed CASC owed BBFI the three lease payments of $832,458.00 each, in their entirety.

[15] Soon thereafter CASC filed suit against Barrentine, its former president, for misappropriation of funds by fraud.

[16] To the extent that findings of fact are involved in the resolution of any of these issues, such findings are reviewed for clear error.

A. Whether the district court abused its discretion when it denied the Baggetts' and BBFI's motion for more definite statement, thereby piercing the corporate veil of BBFI, and granting judgment in favor of CASC and against the individual Baggetts?

B. Whether the district court abused its discretion when it granted CASC's motion to amend the pleadings to conform to the evidence to change count one from an action on an open account to an action for a loan amount due?

C. Under *de novo* review, whether the district court was correct when it ruled in favor of CASC as to the amount of loan due?

D. Under *de novo* review, whether the district court was correct when it denied BBFI's counterclaim for breach of the three-year land lease agreement with CASC?

E. Under *de novo* review, whether the district court was correct when it denied BBFI's and the Baggetts' counterclaims for reformation of the February 5, 1998, security agreement?

## IV.

In this opinion, we discuss only: (D) the issue of the lease and (E) the issue

9

of the security agreement.[17]

A. *The Lease Agreement*

Under *de novo* review, was the district court correct when it denied BBFI's counterclaim for breach of the three-year land lease agreement with CASC? With virtually no discussion, the district court agreed with CASC and found the lease agreement "to be a nullity and consequently unenforceable." We determine that this finding of the district court is incorrect and, for the following reasons, reverse.

CASC argues in its brief that the lease agreement, entered into evidence as Defendants' Exhibit 2:

> . . . was never consummated, no consideration was given to [CASC] nor did either of the parties understand and agree that its existence was controlling . . . there was no meeting of the minds which is required in any basic contract before the same may be enforced . . . [t]he fact is, the lease was simply a proposal or a plan. The Lease was never implemented – [CASC] never took possession of the land or the equipment and the land was never farmed pursuant to the lease . . . Barrentine testified that the lease became unnecessary because a different means of financing the Baggetts was achieved . . . Therefore, just as before, the previous financial arrangement – the open account arrangement – continued as it had since 1997 notwithstanding the existence of the lease document in 1999. The parties then intentionally continued the open account arrangement and disregarded all terms of the lease as if it had never been executed. CASC never made payment to BBFI or the Baggetts under the specific terms of the lease, nor did BBFI ever demand payment of the

---

[17] We find the remaining three issues raised upon appeal to be without merit. These are affirmed without discussion.

lease payments or declare [CASC] in default under the terms of the lease for nonpayment. Neither BBFI nor the Baggetts ever physically leased the property in question to [CASC], nor did [CASC] ever take possession of the land, direct the farming on the land, or apply for any government subsidies on the land. Thus by mutual agreement and action, [BBFI, the Baggetts] and [CASC] understood and agreed it was never a binding agreement between them, and BBFI could not even identify how [CASC] allegedly breached the lease. In short, though the parties may have executed the document which was entitled a lease, the undisputed facts in the record show that neither of the parties ever acknowledged or honored the terms of the lease in any regard . . . The lease was never implemented.

We find these arguments to be without merit. The record clearly demonstrates a valid, enforceable lease agreement signed between the parties, properly witnessed and notarized. The lease is a viable document. It is not a nullity. It was not a proposal. It was not a plan. It was a lease.

Perhaps CASC never actually intended to lease the land from the Baggetts and BBFI with whom it entered the lease. *See United States v. Blankenship, et al.*, 382 F.3d 1110, 1134 (11th Cir. 2004). Even if that were true, the lease did nothing more than give CASC the legal right to lease the land and to sue for breach of contract of BBFI or the Baggetts if they refused to carry through with their promises. *Id.* "The strong likelihood that neither party subjectively intended to carry through on [this] . . . lease[] does nothing to undermine [its] legal efficacy. The enforceability of a contract depends on its objective representations rather

11

than parties' subjective intentions." *Id.* (*citing United States v. Weaver*, 905 F.2d 1466, 1473 (11th Cir. 1990) ("What controls is upon what the parties agreed, not upon what they did not agree. The contract, once created, is to be interpreted in accordance with the objective import of its unambiguous terms.")).

Turning to the judgment of the district court, the district court seems to have overlooked the role of Barrentine in this lease transaction. Recall that Barrentine was the president of CASC in dealing with the Baggetts and BBFI for almost two decades. He signed the binding lease agreement as CASC's agent in his capacity as president of the corporation.

It appears from the record to be well established that CASC found Barrentine, its officer, to be dealing improperly or even fraudulently. It is patently obvious that CASC would prefer not to be bound by Barrentine's activities, however, Barrentine was held out to the farmers as CASC's agent upon whom they should rely in dealing with CASC. They had done so faithfully for seventeen years. Recall that trust was an instrumental part of this relationship as the brothers could neither read nor write.

When CASC broke its relationship with Barrentine, Searle became CASC's president. Searle's recount of the situation according to his testimony in the record was that the Baggetts were owed the three lease payments by CASC.

Like Searle, we conclude that there is no real dispute in the record. The terms of the lease agreement are unambiguous. *See Weaver*, 905 F.2d at 1473. Barrentine discovered and used the ILF processes to obtain, on behalf of CASC, monies necessary to cover the lease amounts due BBFI and the Baggetts, and the Baggetts were never paid the money Barrentine received from the ILF. Other than the fervent wish by the current executives at CASC that Barrentine had never entered into this lease agreement as the agent of CASC, there is no evidence that this lease agreement was anything but a binding legal contract. *See Blankenship*, 382 F.3d at 1134.

CASC suggests in its brief and at oral argument that it should be relieved of any and all obligations owing under the lease for failure of the Baggetts (as Landlord) to have given written notice that some obligation of CASC (as Tenant) had not been done and had been done unknowingly. An example of such obligation would be, *e.g.*, properly maintaining a storage facility from falling into disrepair on the leased premises.

There is no assertion anywhere in the record that this litigation involves any default on the part of CASC, except its failure to pay the amount due under the

13

terms of the lease.[18]  Neither is it suggested that CASC did not know whether or

not it had made payments, under a lease it now claims to be a nullity.  Obviously

CASC is disturbed by a legal document entered into on its behalf by its now

defunct, and apparently unfaithful, former president Barrentine.

CASC cannot say it did not have notice.  Under the lease, it was required to

make lease payments.  If, as it conclusively appears, CASC made no lease

payments, it knew of that default.  Even Barrentine's successor at CASC, Brent

Searle, testified that he had actual notice that CASC had not paid the Baggetts any

money due under the lease, notwithstanding that Barrentine told Searle that at

lease one payment of $832,458 had been paid to them.

Clearly Searle, as company representative, had actual notice.  Any further

notice requirements were clearly waived.

The lease at issue actually created the legal rights it purported to create; the

creation of such legal rights is the sole purpose of a contract.  *See Blankenship*,

382 F.3d at 1134.  A contract is nothing more, and nothing less, than what it

actually states.  *Id.*  The undisputed facts demonstrate that CASC is liable to BBFI

---

[18] It is hornbook law, that, except to the extent a tenant is legally excused from doing so, there is a breach of the tenant's obligation if he fails to pay the rent reserved in the lease on or before the date the rent is due.  *See Restatement (Second) of Property: Landlord & Tenant* § 12.1(1) (2007).  Except to the extent the parties to a lease validly agree otherwise, if there is a breach of the tenant's obligation to pay the rent reserved in the lease, the landlord may recover from the tenant the amount of the rent that is due.  *Id.* at § 12.1(2)(a).

under the lease in the amount of three payments of $832,458, or $2,497,374.

B. *The Security Agreement*

Under *de novo* review, was the district court correct when it denied BBFI's and the Baggetts' counterclaims for reformation of the February 5, 1998, security agreement? CASC argues that neither BBFI nor the Baggetts sustained their burden of proof that the security agreement was intended only to secure the $212,130.75 promissory note, and not liabilities thereafter arising.

Without any discussion, the district court found that the security agreement must be foreclosed. In view of our finding that CASC is liable for the lease payments, and owes more money to the Baggetts than the Baggetts owe to CASC, the judgment of the district court that the security agreement is foreclosed is vacated as moot. This issue requires no further discussion.

## V.

This case is affirmed in part, vacated in part as moot, and reversed in part, with instructions that judgment be entered in favor of BBFI and the Baggetts, and against CASC, in the amount of $2,038,752.40.[19]

---

[19] This sum is comprised of the total lease payments owing BBFI by CASC, reduced by the amount found owing CASC by BBFI and the Baggetts on the open account as determined in the judgment of the district court, including interest. We note that the parties were encouraged many times to settle their differences in mediation.

**AFFIRMED IN PART, VACATED IN PART AS MOOT, AND**

**REVERSED IN PART, WITH INSTRUCTIONS.**